## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

John Doe[1],

        Plaintiff,

   v.

Carleton College,

        Defendant.

> **Jury Trial Demand**
>
> **VERIFIED COMPLAINT**
>
> **Case No.:**

Plaintiff John Doe[1] ("Plaintiff") as and for his Complaint against Carleton College respectfully alleges as follows:

### THE NATURE OF THIS ACTION

1. John Doe seeks damages and injunctive relief from the unlawful actions taken and procedures employed by Defendant and its agents that resulted in the wrongful suspension and then expulsion of Plaintiff, then a sophomore. The suspension and expulsion were the result of a rigged and unfair disciplinary process put in place to rush to a pre-determined result and to minimize legal risk, with deliberate disregard for the consequences to Plaintiff, in violation of both state and federal law.

### THE PARTIES

2. Plaintiff John Doe is of mixed race, and resides in the State of Washington. John Doe was a full-time student at Carleton College in Spring 2017.

---

[1] Plaintiff has filed a Motion to proceed pseudonymously.

3. Defendant Carleton College is a private, liberal arts college and a domestic non-profit corporation incorporated in Minnesota, with its principal place of business located at One North College Street, Northfield, MN 55057.

## JURISDICTION AND VENUE

4. This Court has federal question and supplemental jurisdiction pursuant to 28 U.S.C. § 1331 and under 28 U.S.C. § 1367 because: Plaintiff states claims arising under the Constitution and laws of the United States, including Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-88; and the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the U.S. Constitution.

5. Plaintiff also invokes this Court's jurisdiction pursuant to 28 U.S.C. § 1332, because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

6. This Court has personal jurisdiction over Defendant on the grounds that it is conducting business within the State of Minnesota.

7. Venue for this action properly lies in this district pursuant to 28 U.S.C. §1391 because Defendant is considered to reside in this judicial district and a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## FACTUAL BACKGROUND

**A.      Carleton College**

8. Defendant is a private university with a student population of approximately 2,100 undergraduate students.

9. During the 2016-2017 academic year, the United States Department of Education ("ED") distributed billions of dollars to public and private colleges and universities for students attending their schools. Upon information and belief, Carleton College was a recipient of such federal funding.

**B.     Growing National and Federal Pressure to Hold Male Students Responsible for Sexually Assaulting Female Students**

10. This case arises amidst a growing national controversy stemming from the Department of Education's Office of Civil Rights ("OCR") threats to withhold federal education dollars in order to compel colleges and universities to address so-called "sexual violence" on campuses.

11. OCR's threatened withholding of federal funds puts great pressure on Defendant and other universities to treat male students accused of sexual misconduct with a presumption of guilt and to simply punish the male student in order to avoid jeopardizing the flow of taxpayer dollars, under the guise of making campuses safe for female students.

12. As detailed below, for years, Defendant and other universities were under federal scrutiny from the ED for alleged indifference to sexual violence on campus in violation of Title IX, and for violations of the Clery Act, which requires colleges to keep and disclose information about crime on and near their respective campuses. Title IX compliance is monitored in part by the ED which can impose civil penalties and can suspend institutions from participating in federal student aid programs.

13. Upon information and belief, Defendant's violations of Plaintiff's rights occurred in part because of threats by the federal government that universities could lose federal funding or

face other adverse consequences for not finding male students like Plaintiff responsible for sexually assaulting female students. Evidence of this pressure includes but is not limited to, the White House's April 2014 report entitled "Not Alone", which encouraged schools to combat sexual assault of women on campuses and warnings that if colleges do not adhere to Title IX they "risk[] losing federal funds" and/or face potential lawsuits filed by the Department of Justice."[2]

**C.      Federal Statutory and Regulatory Requirements Concerning Allegations of Sexual Assault.**

14. The issue of sexual assaults on college and university campuses is primarily addressed by an act of Congress known as Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688. Title IX applies to all public and private educational institutions that receive federal funds, including colleges and universities. The statute prohibits discrimination on the basis of sex in a school's "education program or activity," which includes all of the school's operations.[3] A school specifically agrees, as a condition for receiving federal funds, to operate all of its programs and activities in accordance with Title IX and the Department of Education's Title IX regulations. This agreement is known as an "assurance of compliance."[4] In this respect, Title IX is no different from other federal legislation that conditions the entitlement to federal funds on adherence to a federal regulatory scheme.

15. Defendant, as a recipient of federal funds, is bound by Title IX and its regulations, and, upon information and belief, has executed an assurance of compliance.

---

[2] *See https://www.notalone.gov/assets/report.pdf.*
[3] 20 U.S.C. §§ 1681(a), 1687.
[4] 34 C.F.R. § 106.4(a)-(c).

16. Since regulations were first promulgated under Title IX in 1972[5], there has been a requirement that a school "adopt and publish grievance procedures providing for the prompt and equitable resolution of student . . . complaints alleging any action which would be prohibited by" Title IX or its regulations.[6] Both the Department of Education and the Department of Justice have set forth this requirement by way of regulation.[7] It has also long been recognized by "[t]he Supreme Court, Congress, and Federal executive departments and agencies . . . that sexual harassment of students can constitute discrimination prohibited by Title IX."[8] "Sexual Harassment" is broadly defined as "unwelcome conduct of a sexual nature" that includes sexual intercourse, sexual assault, and rape. Student-on-student sexual harassment is prohibited by Title IX, as are other forms of sexual harassment.[9]

17. The Office for Civil Rights ("OCR") of the Department of Education investigates and administratively enforces Title IX as it relates to sexual harassment. In 2001, OCR promulgated regulations pursuant to notice-and-comment rulemaking[10] in a document entitled "Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties" ("2001 Guidance").[11] OCR issued these regulations to "continue[ ] to provide the principles that a school should use to recognize and

---

[5] U.S. Dep't of Education, Office for Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties – Title IX* (2001) at 36 n.98 (notice of publication at 66 Fed. Reg. 5512 (January 19, 2001)) ("2001 Guidance"), available at http://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf.
[6] 34 C.F.R. § 106.8(b)
[7] 34 C.F.R. § 106.8(b) (Dep't of Education); 28 C.F.R. § 54.135(b) (Dep't of Justice).
[8] 2001 Guidance at 2 & n.3.
[9] *Id.* at 2-3 & nn.2, 3, 6, 8, 20.
[10] *Id.* at ii.
[11] *See* note 3 *supra.*

effectively respond to sexual harassment of students in its program as a condition of receiving Federal financial assistance."[12]

18. Title IX's regulations, including the 2001 Guidance, have the force and effect of law, for they affect individual rights and obligations, and were the product of notice-and-comment rulemaking.

19. In the 2001 Guidance, OCR recognized that "procedures adopted by schools will vary considerably in detail, specificity, and components, reflecting differences in audiences, school sizes and administrative structures, State or local legal requirements, and past experience."[13] Nevertheless, OCR has identified a number of factors to be used in determining whether a school's procedures satisfy the "prompt and equitable" requirement of the regulations.

20. First, in a section entitled "Due Process Rights of the Accused," OCR states that the procedures must not only "ensure the Title IX rights of the complainant," but must do so while "according due process to both parties involved."[14] This Title IX "due process" requirement applies to both state and private colleges and universities.[15]

21. The "prompt and equitable" procedures that a school is required to implement to "accord due process to both parties involved" must include, at a minimum: "Notice . . . of the procedure, including where complaints may be filed"; "Application of the procedure to complaints alleging [sexual] harassment . . ."; "Adequate, reliable, and impartial investigation of

---

[12] 2001 Guidance at i.
[13] 2001 Guidance at 20.
[14] Id. at 22.
[15] Id. at 2, 22.

complaints, including the opportunity to present witnesses and other evidence"; "Designated and reasonably prompt timeframes for the major stages of the complaint process"; and "Notice to the parties of the outcome of the complaint . . . ."[16]

22. A school also has an obligation under Title IX to make sure that all employees involved in the conduct of the procedures have "adequate training as to what conduct constitutes sexual harassment," which includes "alleged sexual assaults."[17]

23. In April 2011, OCR issued a "significant guidance document" commonly referred to as the "Dear Colleague Letter."[18] The Letter reaffirmed the vitality of the 2001 Guidance while putting pressure on schools to find male students accused of sexual assault responsible. As set forth in the Letter, OCR states that compliance with Title IX requires the following:

   a. A school's "Title IX coordinator [the official charged with compliance] should review the [school's] disciplinary procedures to ensure that the procedures comply with the prompt and equitable requirements of Title IX."[19]

   b. "Although a school may need to delay temporarily the fact-finding portion of a Title IX investigation while the police are gathering evidence, once notified that the police department has completed its gathering of evidence . . . , the school must promptly resume and complete its fact-finding for the Title IX investigation."[20]

---

[16] Id. at 20.
[17] Id. at 21.
[18] "Dear Colleague" Letter from Russlynn Ali, Assistant Secretary for Civil Rights, U.S. Department of Education (Apr. 4, 2011), available at http://www2.ed.gov/about/offices/list/ocr/letters/colleagues-201104.pdf.
[19] *Id*. at 8.
[20] *Id*. at 10 (emphasis added) (footnote omitted).

   c. The complainant and the accused student "must have an equal opportunity to present relevant witnesses and other evidence."[21]

   d. The complainant and the accused student "must be afforded similar and timely access to any information that will be used at the hearing. For example, a school should not conduct a pre-hearing meeting during which only the [complainant] is present and given an opportunity to present his or her side of the story, unless a similar meeting takes place with the [accused student]."[22]

   e. "Schools must maintain documentation of all proceedings, which may include written findings of fact, transcripts, or audio recordings."[23]

   f. "[S]chools [should] provide an appeals process."[24]

   g. "In sexual violence cases, the fact-finder and decision-maker also should have adequate training or knowledge regarding sexual violence."[25]

   h. "If an investigation or hearing involves forensic evidence, that evidence should be reviewed by a trained forensic examiner."[26]

**D.    2011 Dear Colleague Letter and April 29, 2014 guidance question and answers rescinded, basis fairness to both accuser and accused required**.

24. In September 2017, in response to concerns that prior guidelines had created a system that had gone too far and was treating the accused unfairly, the OCR issued a "significant guidance document" entitled "Q&A on Campus Sexual Misconduct." That Q&A rescinded

---

[21] *Id.* at 8.
[22] *Id.* (emphasis added).
[23] *Id.* at 12 (emphasis added).
[24] *Id.*
[25] *Id.* (emphasis added).
[26] *Id.* (emphasis added).

the Dear Colleague letter and the Questions and Answers on Title IX Sexual Violence dated

April 29, 2014, noting that the withdrawn documents "ignored notice and comment

requirements, created a system that lacked basic elements of due process and failed to ensure

fundamental fairness.[27]"

25. The 2017 Q&A, while reaffirming the vitality of the 2001 and 2006 Guidance Documents,

made notable changes from the guidance provided in the Dear Colleague Letter and the 2014

Q&A Guidance, including:

   a. Removing the requirement that findings of fact and conclusions must be reached by

   applying a preponderance of the evidence standard and allowing institutions to decide

   whether to apply the more likely than not preponderance standard or the highly

   probable clear and convincing evidence standard[28];

   b. Making it clear that the burden is on the institution, and not on either party, to gather

   sufficient evidence to reach a fair and impartial determination as to whether sexual

   misconduct has occurred[29]; and

   c. Removing the 60-day deadline for adjudication of claims in favor of a prompt

   resolution of claims that afforded both parties fairness.

---

[27] https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf
[28] Id. at Question 8
[29] Id. at question 6

**E.      Defendant's Policy Prohibiting Discrimination, Harassment and Related Misconduct**.

26. Defendant's "Policy Against Sexual Misconduct" (hereinafter "Policy") sets forth the definitions applicable to allegations of sexual misconduct.  (See Exhibit 1 – Policy Against Sexual Misconduct).

27. In the Policy effective in April 2017, "Consent" is defined as:

> Consent means the mutual understanding of words or actions freely and actively given by two informed people that a reasonable person would interpret as a willingness to participate in mutually agreed upon sexual activity.

> - Consent is not effective when force, threat, or coercion is used
> - Consent is not effective if the recipient party is incapacitated, asleep, or unconscious
> - Silence or non-communication should never be interpreted as effective consent
> - Consent to one type of sexual activity does not imply consent to other types of sexual activity Past consent is not future consent
> - Consent can be withdrawn at any time

28. "Incapacitation" is defined as:

> Incapacitation is the physical and/or mental inability to make informed, rational judgments. A person is incapacitated if they lack the necessary judgment to give consent to sexual activity. For example, a person may be incapacitated when asleep or under the influence of alcohol or drugs to an extent that the person is not capable of making a knowing decision. Knowledge of incapacity is evaluated based on a reasonable person standard. Accordingly, if a person has sexual contact with someone whom that person knows to be, or whom a reasonable person would know to be, incapable of making a rational, reasonable decision, that contact violates this policy.

> Being intoxicated or under the influence of any substance at the time of sexual contact is never an excuse for violating this Policy

29. "Sexual contact" is defined as:

> **Sexual contact** includes, but is not limited to, intentional touching of the genitals, buttocks, or breasts; coercion to force someone else to touch one's genitals, buttocks, or breasts; penetration of an orifice (anal, oral or vaginal) with the penis, finger, or other object in a sexual manner; or sexual inter - course. Sexual contact can occur over clothing

30. According to the Policy effective April 28, 2017 any employee of Defendant who is not a "Confidential Campus Resource" has an obligation to report that information either directly or through a Community Concern Form to the Title IX Coordinator or the Title IX Deputy for Faculty and Staff.

31. Defendant's "Student Sexual Misconduct Resolution Process" set forth the school's policies and procedures for investigating and adjudicating allegations of sexual misconduct. See (Exhibit 2 – Student Sexual Misconduct Resolution Process).

32. Once the Title IX Coordinator is made aware of the complaint, the Title IX Coordinator will confer with the reporting party in order to consider options, which include whether the complainant wishes to pursue a "Adjudicated Resolution Process" or prefers to resolves the allegation with a "Non-Adjudicated Resolution Process", or whether the Complainant does not wish to pursue a "Resolution Process" of any kind.  If the Complainant wishes to pursue an "Adjudicated Resolution Process", and if, after an investigation, the Title IX Coordinator determines there is sufficient evidence to proceed, a hearing will be conducted.  If the Complainant wishes to pursue a "Non-Adjudicated Resolution", the Title IX Coordinator may initiate that proceeding if both parties agree, but is not bound by that request if the Title IX Coordinator determines the "Non-Adjudicated Resolution Process is not in the best interests of the involved parties or the College."  If the Complainant wishes not to pursue the

matter, the Title IX Coordinator must consider the request, but may go forward with a

response regardless of the complainant's request.

33. The Title IX Coordinator, or a designee may also issue interim restrictions, which include,

but are not limited to

- no-contact or stay away orders between the complainant and the respondent;

- interim suspension;

- temporary exclusion from areas of campus;

- removal from or relocation to another residence hall;

- changes in academic/course schedules; or

- limiting participation in certain events, gatherings, or activities.

34. The "Adjudicated Resolution Process" provided by the College are defined as follows:

2.  Adjudicated Resolution Process

 **a. Investigation**.  Upon initiation of a complaint, the Title IX Coordinator will
ask the College investigator to pursue an investigation. The investigator will
conduct a prompt, thorough and impartial investigation and prepare a written
investigative report.  In most circumstances, the investigator will meet individually
with the complainant and respondent at least once during the investigation.  The
investigator may also meet with other persons who may have information about
the incident, and may review e-mails, text messages, photographs, video
surveillance and/or other physical, documentary, or other evidence as appropriate
and available.  The College will provide an opportunity during the investigation
for both the complainant and respondent to advise the investigator of any
witnesses they believe should be interviewed and other evidence they believe
should be reviewed by the investigator.

At the conclusion of the investigation, the investigator will submit a written
investigative report to the Title IX Coordinator setting forth the information that
was collected.  The investigator will also compile and submit to the Title IX
Coordinator any documents or other evidence that will be provided to the CBSM
panel.  The Title IX Coordinator may ask clarifying questions of the parties or

may ask the investigator to conduct additional investigation if determined necessary.

**b. Charging**.  The Title IX Coordinator will review the investigative report and determine whether there is sufficient information to support charging a student with a violation of the Sexual Misconduct Policy.

> i. If the Title IX Coordinator determines that there is insufficient information to support charging a student with a violation of the Sexual Misconduct Policy, the student will not be charged.
>
> ii. If the Title IX Coordinator determines that there is sufficient information that a student may have violated the Sexual Misconduct Policy, then within 5 business days after the final investigative report is submitted, a written Notice of Charges of Policy Violation (Notice of Charges) will be provided to the respondent and the complainant with summary information that supports the charge(s).

**c. Acceptance of Responsibility**. Within 5 business days after receipt of the Notice of Charges, the respondent has an opportunity to accept or not accept responsibility for the charge(s).

> i. If a respondent is charged and accepts responsibility for having violated the Sexual Misconduct Policy, the Title IX Coordinator will forward the case to the Community Board on Sexual Misconduct [CBSM] panel for determination of sanctions only.
>
> ii. If a respondent is charged but does not accept responsibility for having violated the Sexual Misconduct Policy, the Title IX Coordinator will forward the case to the CBSM panel for determination of both responsibility and sanctions.

**d. Adjudication Hearing**

> **i. Adjudicator**.  The CBSM hears all cases that proceed to an Adjudication Hearing.  CBSM members receive annual training on issues related to sexual harassment, sexual assault, intimate partner violence, stalking, and how to conduct an investigative and decision-making process that protects the safety of all and promotes accountability.
>
> **ii. Hearing Goals**.  During a CBSM hearing, a CBSM panel determines whether there has been a violation of the College's Sexual Misconduct Policy.  The hearing is intended to facilitate a decision based on information gathered during the investigative process and presented at the hearing.  It is not intended to be an adversarial proceeding.  The hearing is not a legal process, and it is not intended to mimic or substantially duplicate a civil or criminal trial.

The goals of the hearing are 1) to allow both the complainant and the respondent the opportunity to present their experiences and discuss the investigative report; 2) to allow an impartial panel to ask questions, consider the information presented, and decide whether a Sexual Misconduct Policy violation has occurred; and 3) if a violation is found, to allow the CBSM the opportunity to ask questions relevant to sanctions and determine appropriate sanctions for a violation.

**iii. Preparation for the Hearing**. The Title IX Coordinator or a designee will arrange the administrative details for the hearing, including: 1) selecting the members of the CBSM panel to hear and decide the complaint; 2) arranging a time and place for the hearing; and 3) making the investigative report and accompanying documentary or other evidence available to the panel members and to the parties.

**iv. The Panel**.  In preparation for a hearing with a CBSM panel, the Title IX Coordinator selects a three-person panel from the full roster of trained board members to hear and adjudicate the complaint.  The panel will ordinarily consist of one faculty, one staff, and one student representative. Before the panel is selected, the Title IX Coordinator will provide to the complainant and respondent the list of CBSM members available to serve on the panel.  The complainant and respondent then have 48 hours to submit a written objection if the party believes that any prospective panel member has a conflict or is otherwise unable to fairly evaluate the information presented. After the panel is selected, the Title IX Coordinator will also inform the panel members of the parties' identities to determine whether any panel member has a relationship with either party that would affect their ability to decide the case impartially. The Title IX Coordinator will evaluate any objection by a party or potential conflict identified by panel members and determine which board members will serve on the panel.

**v. Role of the CBSM Chair in the Hearing**.  The College Title IX Coordinator ordinarily serves as the CBSM chair.  The chair's role is to ensure that procedures are followed and that Title IX requirements are met. The chair facilitates and is present for all phases of the hearing, but does not take a substantive role in the deliberations or vote following deliberations.  The chair will resolve all questions that arise during the hearing, including but not limited to procedural issues and issues regarding the propriety or relevance of specific questions, arguments, and information presented.  The CBSM chair will also seek to ensure an orderly and fair exchange of information and perspectives during the hearing. If anyone

attending the hearing acts without appropriate respect or decorum, the chair may ask them to leave the hearing. In consultation with the CBSM chair, the panel will determine whether it is necessary for the panel to hear and/or question particular witnesses.

**vi. Role of Advisers**.  The adviser's role at the hearing is to offer support and assistance in a manner that does not disrupt the proceedings.  Advisers will not be permitted to offer written or oral information to the panel. Students will be responsible for presenting their own statements and for answering the panel's questions.  For more detailed information about the role of advisers, see the Advisers' Role and Responsibilities document available at this link.

**vii. Role of Additional Support Individuals**.  In addition to an adviser, each complainant and respondent may have up to four other individuals present in a nearby support room during a hearing.  These support individuals may not be present in the hearing room or participate in the hearing in any way.

**viii. Hearing Procedures**.  Hearings are private and are not open to members of the College community or the public. Present during a hearing are the three CBSM panel members, the CBSM chair, the complainant, the complainant's adviser (if any), the respondent, and the respondent's adviser (if any). Any additional persons in attendance must be approved by the CBSM chair.  During the hearing, complainants and respondents will be offered the opportunity to present prepared initial statements orally.   The panel will then have the opportunity to ask the complainant and respondent questions.  After the panel has had the opportunity to ask questions, the complainant and respondent will be offered the opportunity to make final oral comments.

At either party's request, the hearing can be set up so that the complainant and respondent will have minimal interaction during the hearing or will not be in the hearing room at the same time.

**ix. Information Considered by the CBSM Panel**.  In reaching a decision, the panel will only consider information included in the investigative report or presented at the hearing, pertinent College policies, and other documents or materials shared with the panel by the Title IX Coordinator. A party's decision to not participate in an Adjudication Hearing does not preclude a determination regarding a complaint. Silence in response to an allegation will not be viewed as an admission of the allegation, but may leave the allegations undisputed.

Information about unrelated past behavior of the complainant and/or respondent, including the sexual history or dress of either party, will typically be excluded from consideration.

**x. Determination of Violation or No Violation**.  Following the presentation of information at the hearing, the CBSM panel will determine whether a violation of the Sexual Misconduct Policy occurred.  The CBSM panel will deliberate in private. In reaching a decision, the panel will apply **a preponderance of the evidence standard**, and will conclude that a violation occurred if it is "more likely than not" that a violation occurred. The panel will reach a decision by majority vote.

The chair will orally report the panel's decision to the complainant and respondent before the commencement of the sanctioning phase of the hearing.

**xi. Sanctioning**.  If the panel determines that the respondent violated the College's Sexual Misconduct Policy, the hearing will continue.  The panel will then allow both the complainant and the respondent to express their views orally about appropriate sanctions.  The panel will then deliberate further to determine appropriate sanctions.

In determining sanctions, the panel's objective will be to ensure campus health and safety by preventing the recurrence of problematic behavior and addressing its effects, including the effects of the violation on the complainant.  The panel may consider a variety of factors in determining sanctions, including, but not limited to, the type of misconduct, the wishes of the complainant, the weight of the evidence, and the respondent's disciplinary record. The sanctioning decision will also be informed by the degree to which the behavior was intentional, irresponsible, or without knowledge.

The complete disciplinary record of the respondent will be made available to the panel by the Dean of Students Office for use during sanctioning. Possible sanctions include, but are not limited to:
Dismissal from the College
Suspension for one or more terms, with or without conditions for return
Disciplinary Probation
No Contact or Limited Contact Order
Chemical Health Assessment
Restricted Campus Access
Restricted Course Enrollment

Change of Housing
Warning
Required education or training
Sanctions may be combined.

A majority vote of the CBSM panel is required for all sanctions.

After the panel has reached a decision about sanctions, the chair will orally communicate the decision to the complainant and respondent, each separately.

The sanctions imposed by the CBSM do not go into effect until the appeal period has passed.

The Title IX Coordinator will follow up to ensure compliance with the sanctions determined by the CBSM panel and will maintain the resulting disciplinary record in accordance with the College Student Records policy.

### xii. Record of the Hearing

Hearings will be audio recorded by the College for use in the event of an appeal. No other recordings are allowed.  The recording and any notes taken during the hearing by any panel members, including the CBSM chair, will be maintained in accordance with the College's Student Records Policy.  The Title IX Coordinator will maintain the resulting disciplinary record in accordance with the College Student Records policy.

### xiii. Notice of Outcome

The parties will also receive simultaneous formal written notice of the hearing outcome.  The College will strive to provide the written notice of outcome to the parties within two business days following the hearing.  In some cases, more time may be required.

The determination of the CBSM panel may be appealed as provided below. In the event that no appeal is filed within the time periods prescribed below, the decision will be final.

### e. Appeal

Both parties have the right to appeal the outcome on any of the following grounds:
- procedural errors substantially impacted the final decision;
- relevant new information has come to light that was not available at the time of the hearing and would have substantially affected the panel's decision;
- the sanction is inconsistent with the seriousness of the offense.

A Statement of Appeal must be made in writing to the Title IX Coordinator within 5 business days of the date that the party receives written notification of the panel's decision and the sanctions imposed, if any. Any sanctions imposed by the CBSM are held in abeyance until the deadline for submission of a Statement of Appeal has passed. Once a student has submitted a Statement of Appeal, the sanction(s) will continue to be held in abeyance pending final appeal decision outcome.

The appeal adjudicator is the Dean of Students.  In the event the Dean of Students is unavailable or has a conflict, the Vice President/Treasurer will act as the adjudicator.  The appeal adjudicator determines the merits of the appeal and determines an appropriate remedy, if any.

Within 24 hours of receiving a Statement of Appeal, the Title IX Coordinator will notify the nonappealing party that an appeal has been filed and will communicate the basis of the appeal.  The Title IX Coordinator will provide a copy of the Statement of Appeal to the non-appealing party. If the non-appealing party wishes to respond, they will have 3 business days to submit a written response to the appeal adjudicator.

The appeal adjudicator will act upon an appeal within a reasonable time, normally 5 business days after their receipt of the Statement of Appeal and any written response to the statement of appeal.  After the appeal is decided, the appeal adjudicator will notify both parties concurrently in writing of the decision. Decisions of the appeal adjudicator are the final institutional response and may not be appealed.

## F.    The Night of April 27 and Morning of April 28, 2017

35. On or around April 23, 2017, Plaintiff received an email containing language about "a

   tradition of excellence" and an invitation to a meeting on campus set to take place at 2:00

a.m. on April 28, 2017. Plaintiff was instructed that if he wanted to take part, he was to meet at the Japanese Pagoda on campus at 2:00 a.m. and told not to speak to anyone about the message.

36. Over the course of the week leading up to the event, Plaintiff received several items, including a rock and a potato, that said "DO NOT LIVE IN FEAR" on them.  In addition, several upperclassmen approached Plaintiff over the course of the week and said "DO NOT LIVE IN FEAR" when they passed by him.

37. At approximately 2:00 a.m., on Friday April 28, 2017, as instructed, Plaintiff arrived at the Japanese Pagoda, where a number of people had gathered and a box of alcoholic beverages awaited.

38. There were also a number of masked upperclassmen, who appeared to be in charge, who told the invitees they were being invited to join a secret group (DTX), and that if they did not want to take part in what was to come, they needed to leave. No one left.

39. At that location, Plaintiff, along with most of the group, consumed beer, wine, and shots of hard alcohol.

40. After most of the alcohol at the location was consumed, the group was instructed to go to then tennis courts down the hill from the Japanese Pagoda.

41. At that location there was another group of masked students, who provided the initiates with a box of jello shots and a case of beer, which they were instructed to consume.

42. Plaintiff vomited after chugging a beer at the tennis courts.

43. When the alcohol at the tennis courts was consumed, the initiates were told to go to the Goodsell Building, where masked students had a variety of beer and hard liquor the initiates were instructed to consume.

44. When the alcohol at the Goodsell Building was finished, the initiates were told to go to Stewsie Island, where masked students gave them wine, rum, rice krispy treats, and cheese.

45. The initiates were told to drink the alcohol and consume the food.

46. When the food and alcohol was gone, the initiates were then told to go to the hill of three oaks where masked students gave them lime-o-rita's and a bottle of Hot 100.

47. When the entire group arrived at the hill of three oaks, the entire group walked to the arboretum, where there was a bonfire.

48. At the bonfire, the masked students revealed their faces and told the initiates they were being initiated into their secret club called DTX.

49. The initiates then passed around and drank from the bottle of hot 100 while being given "new names" from the upperclassmen group members.

50. Once the bottle was finished, the initiates were instructed to go to the School President's House (Steve P) where they were to cover the house in toilet paper.

51. When the group left the bonfire, Plaintiff walked with his roommate and another friend who had been initiated.

52. Plaintiff and his roommate both had to be at a 6:00 a.m. workout for football, so they tried to stay together.

53. As the group neared the school president's house, they stopped at Central Park next to the Weitz Center for a bathroom break. When everyone was ready, they continued towards the President's House.

54. Following this stop, Jane Doe approached Plaintiff and introduced herself.

55. Plaintiff stated that he did not believe he had seen Jane Doe on campus before, and Jane Doe explained that she had not been on campus much as she had gone to study abroad twice.

56. As they walked, Plaintiff and Jane Doe talked.

57. Jane Doe explained that she was a Religion major and Plaintiff stated he was an Economics major.

58. They also discussed things they were involved in on campus, with Plaintiff explaining he played football and was on the club lacrosse team and Jane Doe explaining that she played frisbee.

59. Plaintiff was friends with another person on the frisbee team, so they talked about how they were both friends with that person.

60. Jane Doe also mentioned to Plaintiff an individual who she stated had lived on her floor during her freshman year.  Plaintiff believes this was a reference to one of the masked students Jane Doe knew.

61. While this conversation was taking place, the group continued to walk toward the president's house.

62. Plaintiff was careful to stay with the group because he did not know where the president's house was and wanted to stay near his roommate so they would both be sure to make it on time to their morning workout.

63. As Plaintiff and Jane Doe were walking with each other, Jane Doe came to a stop, which halted Plaintiff because Jane Doe had her arm around Plaintiff.

64. At that time, Plaintiff looked at Jane Doe and said "what", and Jane Doe started kissing Plaintiff.

65. Plaintiff took a step back out of confusion and suggested they continue walking to keep up with the group.

66. After a few more feet, Jane Doe stopped Plaintiff again and kissed him more.

67. While Plaintiff and Jane Doe kissed, Jane Doe grabbed Plaintiff's penis over his clothes.

68. At that point, Jane Doe suggested she and Plaintiff find somewhere to sit, so they went back to Central Park and sat near a tree while talking about how crazy the night had been.

69. Plaintiff and Jane Doe then kissed more, with Jane Doe continuing to rub Plaintiff's penis through his clothes.

70. Plaintiff then said that he felt uncomfortable doing what they were doing in the middle of the park and Jane Doe suggested that they go to Plaintiff's dorm room, which was closer than hers.

71. Plaintiff and Jane Doe then then started to walk toward Plaintiff's dorm.

72. On their way, they ran into some people who were part of the larger group, who said that campus security was approaching, so Plaintiff and Jane Doe followed the group away from the area.

73. During this time, Plaintiff saw his roommate, standing with a number of other people, and told him that he had Jane Doe would need the room.

74. While standing in a group of people, Plaintiff's roommate responded "okay".

75. Plaintiff later sent a message in his roommate group chat also requesting privacy in the room.

76. Plaintiff and Jane Doe then continued to walk toward Plaintiff's dorm.

77. At the outside entrance to the dorm, Plaintiff got out his OneCard, which was attached to his phone, and scanned them into the building.

78. As they walked into the building, Jane Doe began kissing Plaintiff's neck, which made Plaintiff laugh as they walked up the steps.

79. Plaintiff and Jane Doe then entered Plaintiff's room, where they sat on the couch, making out.

80. After some time, Plaintiff excused himself to use the bathroom, and went to the hallway bathroom to use the restroom.

81. Plaintiff also took a cup, which he filled with water that he then shared with Jane Doe as they sat on the couch in his room.

82. Jane Doe thanked Plaintiff for the water, and Plaintiff mentioned that he would need to leave soon for his morning workout.

83. Jane Doe stated that was "okay" and she and Plaintiff started kissing again.

84. Plaintiff and Jane Doe then undressed, with Jane Doe removing Plaintiff's shirt, then Plaintiff removing Jane Doe's shirt, then Jane Doe helping Plaintiff remove his pants, and then Plaintiff helping Jane Doe take off her boots, while Jane Doe undid the top of her pants and pulled them to her knees, where Plaintiff finished removing them.

85. When Plaintiff and Jane Doe finished removing their clothes, Jane Doe said she was on birth control, but said Plaintiff should get a condom.

86. Plaintiff then walked to his closet, got a condom, and then returned to the couch.

87. Before starting, Plaintiff checked with Jane Doe and asked if she was certain that she wanted to have sex and was comfortable with doing it.

88. Jane Doe responded by saying "Yes I am", to which Plaintiff responded, "Are you sure? I want to make sure we are on the same page." Jane Doe giggled and said "Yes I am".

89. Plaintiff then put on the condom and penetrated Jane Doe.

90. Plaintiff bumped into Jane Doe's face a few times and apologized, to which Jane Doe would react and respond with "it's okay" and laugh.

91. While Plaintiff was on top of Jane Doe, he struggled to maintain an erection and told Jane Doe.

92. Jane Doe responded, saying "Hey you're doing okay don't worry".

93. Eventually, Plaintiff and Jane Doe switched positions so that Plaintiff was laying on his back.

94. From this position, Jane Doe aggressively stroked Plaintiff's penis to get him erect.

95. After a few minutes of this, Jane Doe got on top of Plaintiff and used her hand to insert Plaintiff's penis into her vagina.

96. Jane Doe then rocked back and forth while Plaintiff laid on his back with his hands behind his head.

97. Plaintiff's room consisted to two (2) rooms with a bathroom connecting them.

98. While Jane Doe was on top of Plaintiff, Plaintiff heard a knock at the bathroom door and then his roommate telling him to hurry up through the door because they had to be at workouts in 10 to 15 minutes.

99. Around this same time, the alarm Plaintiff had set on his phone went off, and Plaintiff turned it off.

100. Plaintiff told Jane Doe they would need to hurry because he had to go, and Jane Doe responded "No problem, its fine."

101. A few minutes later, the second alarm on Plaintiff's phone went off and he got up and dressed in a hurry after he saw a friend had texted him saying he had to go right away.

102. While Plaintiff was dressing, he told Jane Doe that she was welcome to stay as long as she wanted and that if she wanted, she could use any of Plaintiff's clothes.

103. Jane Doe responded, "Aw, thanks. That's nice of you," and then stood up from the couch and kissed Plaintiff before he ran out of the room and down the stairs on his way to the stadium for workouts.

104. At the workout, Plaintiff vomited during warmups.

**G.    Jane Doe Leaves Plaintiff's Room**

105. Approximately one minute after Plaintiff left his room, according to video evidence, Jane Doe left his room wearing one of Plaintiff's shirts.

106. Jane Doe wandered down the hallway and around for a while, looking for a bathroom, before going up the stairs to the next floor.

107. There, Jane Doe entered a room that was on that floor.

108. There, a male student awoke to find a female wearing a t-shirt, underwear, and socks asking to lay down.

109. He pointed to his roommate's bed, because it was empty, and Jane Doe laid down.

110. The student's roommate returned a few minutes later, and saw Jane Doe in his bed.

111.   He asked her who she was and told her to leave.  Jane Doe said she was "sorry" and rolled over to go back to sleep, so they called campus security to get Jane Doe.

112.   The students were able to get Jane Doe out of bed and into the hallway, where they made small talk with her.

113.   The students noted that Jane Doe seemed sluggish and unsteady on her feet, but knew her name and was able to talk about her studies.

114.   The students remained with Jane Doe until campus security arrived.

115.   When security officer Steven Hanson arrived, he found Jane Doe and the students in the hallway outside of the students' room.

116.   Security Officer Hanson felt that Jane Doe was intoxicated based on her slurred speech and not knowing where the rest of her clothes were.

117.   Security officer Hanson contacted the on-call area director, Taylor Morgan and questioned Jane Doe regarding whether she wanted to be examined at Northfield Hospital because of her condition.

118.   Jane Doe indicated she just wanted to go to her room to sleep.

119.   Security officer Hanson then escorted Jane Doe to the main entrance to Davis Hall.  Jane Doe was able to walk under her own power.

120.   Taylor Morgan then met Jane Doe and security officer Hanson in the main entrance at 6:20 a.m.

121.   Hanson and Morgan then drove Jane Doe to her dorm in a campus security vehicle.

122.   During that drive, Jane Doe identified her roommate and said that she would be in the room.

123.    When they arrived at the room, the roommate was present, but indicated she had to leave

for class soon.

124.    At that point, security officer Hanson decided he was going to call for an ambulance to

have Jane Doe's condition assessed.

125.    While security officer Hanson and Taylor Morgan waited with Jane Doe for the

ambulance to arrive, security officer Hanson asked Jane Doe if she had been assaulted. Jane

Doe stated that she had not been assaulted and must have entered the wrong room.

126.    As Hanson and Morgan continued to question Jane Doe about why she was in Davis Hall

and not wearing pants, Jane Doe explained she might have been in that dorm because she

wanted to hook up with someone there.

127.    After that exchange, Jane Doe began to vomit.

128.    Shortly after that, EMTs arrived to assess Jane Doe.  EMTs found her alert and oriented

to place, person, and time, but unable to give correct answers to certain questions.  For

example, when asked who the president was, Jane Doe stated "Steve P.", Carleton's

President, which is how many students refer to Carleton's president, and when asked again

stated "Bush."  Jane Doe also stated that she was a member of a "secret society", like a frat,

but they don't have those at Carleton.

129.    During transport to the hospital, Jane Doe vomited in the ambulance.

130.    At the hospital, doctors noted that Jane Doe was not slurring her words and seemed

remorseful about being there.  She was given IV fluids and discharged home.

**H.      Plaintiff Returns to an Empty Room**

131.    At approximately 7:30 a.m., after his workout and breakfast with his teammates, Plaintiff

          returned to his room.

132.    Jane Doe was not there, but some of her clothes, including her boots, and her OneCard

          were still in the room.

133.    There was vomit on the floor and a used tampon near the garbage can.

134.    Plaintiff assumed that Jane Doe had put on some of his clothes and gone back to her

          room.

135.    Plaintiff wanted to let Jane Doe know she could get her stuff any time, but did not know

          how to contact her.  He then recalled that they had a common friend from Jane Doe's frisbee

          team, so he asked the teammate for Jane Doe's number.

136.    At approximately 11:46 a.m., Plaintiff texted Jane Doe to let her know that some of her

          stuff was still in his room and that she could come by to pick it up.

137.    At around 7:30 p.m., Jane Doe went to Plaintiff's room to get her stuff. Plaintiff was not

          there, but left his room unlocked so Jane Doe could retrieve her belongings.

138.    After that, she texted Plaintiff asking if they had sex.

139.    Plaintiff responded by stating that the night was mostly a blur, but he did remember

          having sex.

140.    Jane Doe responded by asking if they had used a condom, which Plaintiff stated they had.

**I.      Jane Doe Makes a Sexual Assault Report**

141.    At around 3:00 p.m. an April 28, 2017, Jane Doe went to practice, where she reported

          still feeling drunk.

142.   Around 6:00 p.m., Jane Doe started to sober up and began to feel she had been dangerously intoxicated, and started to get scared after talking with her friends, who felt she might have been raped.

143.   Around 10:30 p.m., Jane Doe went to speak with security officers, and spoke with Ryan Holicky and Steve Romenesko, the area director on call at that time.  Title IX Deputy Laura Haave was also present at this meeting. During this meeting, Jane Doe asked if she would face discipline for underage drinking.

144.   Ms. Haave was appointed to be Jane Doe's support person during these proceedings.

145.   Ms. Haave's online presence indicates a strong anti-male stance.  (See Exhibit 3 - Haave Twitter Posts)

146.   About 20 minutes after this meeting ended, Jane Doe called campus security and asked for a ride to the hospital for a sexual assault evaluation.

147.   At the hospital, Jane Doe explained that after she sobered up and talked to some people, including discussions via Facebook, she felt there were issues with the "informed consent" to having sex.  She was also concerned about a possibly retained tampon.

148.   The Facebooks discussions that lead to Jane Doe's decision were never submitted as evidence in this matter.

149.   Jane Doe then underwent a sexual assault examination. There was no retained tampon.

150.   Campus security forwarded their reports to Title IX Coordinator Amy Sillanpa.

**J.     Plaintiff is Informed of Allegations**

151.   On May 3, 2017, Plaintiff received am email from Title IX Coordinator Amy Sillanpa, stating that Carleton had issued a mutual no contact order between Plaintiff and Jane Doe.

152.    That notice informed Plaintiff of locations he could not be on campus, but provided no

explanation of the basis for the order. (See Exhibit 4 – No Contact Order)

153.    On May 10, 2017, Plaintiff received an email from Amy Sillanpa informing him that Jane

Doe had filed a complaint against him alleging Plaintiff violated the school's sexual

misconduct policy on April 28, 2017.  (See Exhibit 5 – May 10, 2017 Email to Plaintiff from

Amy Sillanpa).

154.    That email contained links to certain Carleton policies regarding sexual misconduct and

informed Plaintiff that he was to attend a meet with Ms. Sillanpa where he would not be

expected to answer questions about the allegation, but would be given information about the

process.

155.    It also informed Plaintiff that he would meet with Mary Dunnewold, "our college

investigator".

156.    Mary Dunnewold, the investigator, is an alumna of St. Olaf, majoring in women's

studies, is a Title IX Deputy and Carleton, and has presented at Carleton College regarding

sexual assault.

157.    Ms. Dunnewold's training materials to students consists of examples of male perpetrators

deemed responsible for sexual misconduct for engaging in sexual intercourse with a female

complainant under a variety of circumstances.  (See Exhibit 6 - Carleton Voice Article

"A Matter of Consent" quoting Mary Dunnewold; Exhibit 7 – Carleton Voice article "Locker

Room Talk").

158.    This is consistent with Carleton College's Evidentiary Exams with a SANE Nurse

website, which presumes students seeking evidentiary exams will be female by stating

"SANE Nurses are all female, and are on-call 24 hours a day."

https://apps.carleton.edu/dos/-sexual_misconduct/get_help/immediate_help/sane_exams/

## K.   Plaintiff Meets with the College's Investigator

159.   That meeting happened on May 16, 2017.

160.   Plaintiff was accompanied by his attorney, Jonathon Reppe.  The meeting lasted for about 45 minutes.  Investigator Dunnewold asked Plaintiff to explain what happened on the night in question and presented Plaintiff with video from that night.

161.   During the interview, Investigator Dunnewold asked Plaintiff to explain what the video footage looked like was occurring, which Plaintiff did.

162.   Investigator Dunnewold also asked Plaintiff if there was anything else he would like to add, to which he stated that he would like the report to include that Jane Doe was the aggressor and initiated contact with him and maintained her consent at all times. Investigator Dunnewold stated "I will take note of that."

163.   Specific details provided by Plaintiff included that he met Jane Doe that night.

164.   Jane Doe kissed him several times and grabbed his penis.

165.   The pair then went to Plaintiff's room, where they engaged in consensual sexual intercourse, where he asked Jane Doe for verbal consent on several occasions, and during which time Jane Doe stated she was on birth control and asked Plaintiff to use a condom.

166.   Plaintiff also explained that while he and Jane Doe had both been drinking, Jane Doe was coherent, able to walk and talk clearly, and had been telling him about people and events she was involved in, in such a manner that Plaintiff had no reason to believe Jane Doe was intoxicated to the point of incapacity.

167.　He also explained that during intercourse, Jane Doe got on top of him on the couch, stroked his penis, used her hand to place his penis into her vagina, and was able to move freely and maintain her balance while on top of him on the couch.

## L.　Plaintiff Meets with Northfield Police Investigators

168.　On May 19, 2017, Plaintiff met with investigators from the Northfield Police Department.

169.　During that interrogation, Plaintiff provided details entirely consistent with what he told the College's investigator.

170.　Specifically, Plaintiff explained that he was invited to an initiation event for a secret society.

171.　At that event, he drank numerous kinds of alcohol, and, at one point, vomited after consuming beer.

172.　Later in the night, he met Jane Doe, and they started talking.

173.　At some point, Jane Doe kissed Plaintiff, and, after that, they walked together, occasionally stopping to kiss.

174.　During one of the times they were kissing, Jane Doe grabbed Plaintiff's penis through his pants.

175.　After that, Plaintiff and Jane Doe started going toward Plaintiff's dorm room, where they ended up having sexual intercourse. This occurred because Plaintiff said he was uncomfortable engaging in this heavy petting outside and Jane Doe suggested they go to Plaintiff's dorm room.

176.   Plaintiff explained that he was aware Jane Doe had been drinking, as had he, but felt that Jane Doe was aware of what she was doing and was a willing participant in the sexual contact to the point that he considered her the aggressor in initiating it.

177.   Plaintiff was charged, by summons and complaint, with third-degree criminal sexual conduct on July 17, 2017.

178.   As part of the discovery process in the criminal case, Plaintiff learned of the following evidence that had been provided to law enforcement by Defendant but had not been included in the Investigative Report presented at Plaintiff's hearing or in the materials that Plaintiff was provided:

   a.   Video evidence that contradicted Jane Doe's account of her physical state while awaiting EMT assistance;

   b.   Audio evidence of Jane Doe's conversation with campus security;

   c.   Evidence that Jane Doe asked campus security if she would face discipline for underage drinking before filing her complaint and being told by Title IX Coordinator Amy Sillanpa that she would not face discipline if it was part of a sexual assault claim;

   d.   That Security Director Romenesko's supplement was missing from the initial Security Report used at the school's hearing.

179.   Despite the above described video and audio evidence being provided by Defendant to the Northfield Police Department, Plaintiff was never notified of the existence of this evidence during the course of Defendant's proceedings against him.

180.   Plaintiff also learned through discovery provided in the criminal proceedings that Jane

Doe stated that after learning she and Plaintiff had sex, Jane Doe spoke to a friend and told

the friend that she felt she had been sexually assaulted because she did not remember having

sex, but that Jane Doe did not remember doing anything such as saying no, pushing Plaintiff

away, or any other kind of dissenting action.

181.   This information was not contained in the Investigative Report used to expel Plaintiff.

182.   The charges against Plaintiff were dismissed by the prosecution in August 2018.

**M.    Defendant's Disciplinary Proceedings against Plaintiff**

183.   Following this meeting, Plaintiff received a letter from Amy Sillanpa, dated May 19,

2017, informing him that Ms. Sillanpa had reviewed the Investigative Report and had

concluded that there was sufficient information to charge Plaintiff with a violation of the

Sexual Misconduct Policy.  (See Exhibit 8 – May 19, 2017 Letter from Amy Sillanpa to

Plaintiff).

184.   The letter further informed Plaintiff that he had five (5) days to either accept

responsibility for the charge or not accept responsibility for the charge, and if he did not

accept responsibility, a hearing before the Community Board on Sexual Misconduct would

take place at May 31, 2017, at 5:30 p.m.

185.   Plaintiff was also informed that he would be allowed to see the Investigative Report after

2:00 p.m. on Monday, May 22, 2017, and that he would be allowed to submit, in writing,

challenges to the Report, which may or may not be considered.  (See Exhibit 9 -Investigative

Report).

186.    Despite being allowed to review the Investigative Report, Plaintiff was not allowed to

hear the recordings upon which Investigator Dunnewold's version of events were based.

187.    Plaintiff later became aware that certain evidence presented with the report, including the

text messages presented as Document 1 of the Investigative Report, did not contain all the

messages that were a part of the actual document, with important evidence weighing on the

credibility of certain witnesses about what they saw and how concerned they were about

what they saw excluded.

188.    This included the GroupMe texts provided by Jane Doe, and included in the Investigative

Report, that were edited to remove a photograph of one of Jane Doe's support witnesses that

showed the witness in a celebratory mood at the end of the night, which is contrary to her

testimony that she spent the end of the night worried about Jane Doe.

189.    Plaintiff was also informed that he was to schedule a meeting with Ms. Sillanpa in

preparation for the May 31, 2017 hearing.

190.    That meeting occurred May 25, 2017, with Plaintiff's attorney present.

191.    At that meeting, Plaintiff's attorney asked if Plaintiff was able to ask or present questions

at the hearing.  Ms. Sillanpa said Plaintiff would not be allowed to introduce questions.  He

was also told that witnesses would not be necessary at the hearing, as he would not be

allowed to present any.

192.    At that meeting Plaintiff also inquired whether Jane Doe submitting at an article to the

Carleton College CLAP accusing Plaintiff of sexual assault was considered retaliation.

193.    Plaintiff was informed that it was not considered retaliation because it did not mention his

name, even though two (2) students interviewed by Mary Dunnewold said they knew what

happened because of the CLAP article and even though Plaintiff had been told not to attend an upcoming lacrosse social event because of the article.

194.   The hearing before the Community Board of Sexual Misconduct took place on May 31, 2017.

195.   Plaintiff was allowed to hear Jane Doe's testimony from a separate room.

196.   However, he was not allowed to ask any questions and was not allowed to present any evidence other than his text conversation with Jane Doe.

197.   Plaintiff did submit an article from the National Institute of Health called "What Happened? Alcohol, Memory, Blackouts, and the Brain."  This article was submitted to explain why Jane Doe could not remember what happened while blacked out even though she remained capable of rational thought and conversation during her interactions with Plaintiff.

198.   During Jane Doe's rebuttal, Jane Doe attempted to introduce an alleged anonymous complaint against Plaintiff from a second student without any evidence.

199.   During Plaintiff's rebuttal, he clarified certain allegedly incriminating statements, such as telling Jane Doe to keep moving and provided additional details about the sexual encounter.

200.   After deliberation, the panel found Plaintiff responsible based on the evidence presented by the CBSM Chair/Title IX Coordinator.

201.   On or around May 31, 2017, Plaintiff was informed by Ms. Sillanpa that the CBSM had found he committed sexual misconduct and had recommended that he be suspended for three (3) terms.

202.   Jane Doe was also informed of the results of that hearing at around the same time.

Plaintiff could hear Jane Doe screaming after being told of the sanction

203.   On June 2, 2017, Plaintiff received a letter from Ms. Sillanpa, explaining he had been

found responsible for committed sexual misconduct and explaining he had the ability to

appeal the determination on the basis of: "1) procedural errors that may substantially

impacted the final decision; 2) relevant new information that was not available at the time of

the resolution meeting, and would have substantially affected the Panel's decision; and/or 3)

the sanction is inconsistent with the seriousness of the offense." (See Exhibit 10 – June 2,

2017 Letter from Amy Sillanpa to Plaintiff).

204.   On June 9, 2017, Plaintiff submitted an appeal of the CBSM panel decision and sanctions

imposed. (See Exhibit 11 – June 9, 2017 Appeal Letter).

205.   In his appeal, Plaintiff argued that:

1.   The procedure used by Carleton College (Carleton) did not meet the requirements
     established by the Department of Education's Office of Civil Rights (OCR) and resulted in
     procedural errors which substantially impacted the decision.

2.   The CBSM Panel did not have all of the relevant information pertaining to his intoxication
     and the relative incapacitation of the parties, including the entire GroupMe text messages
     that included photographs of Jane Doe's witness.

3.   The sanction is inconsistent with the seriousness of the offense based upon the facts
     alleged.

206.   Prior to initiating his appeal, Plaintiff requested that he have access to the actual audio

recordings of witness statements, not just the summary Investigator Dunnewold included in

the Investigative Reports.

207.   This request was denied.

208.   Jane Doe also appealed, arguing that the three (3) term suspension was not sufficient

punishment and stated the sanctions did not send a strong enough message to the campus

community.

209.   In a letter, dated June 19, 2017, Dean of Students Carolyn Livingston denied Plaintiff's

appeal, stating the evidence showed that "[Jane Doe] was clearly incapacitated".  Ms.

Livingston also granted Jane Doe's appeal, amending Plaintiff's punishment to permanent

expulsion, stating that "The fact that you continue to assert that it was acceptable to engage

in sexual activity with a person in [Jane Doe's] condition is deeply troubling and shows that

your continued attendance at Carleton would pose a danger to not only her, but other

members of the community as well."  The letter also stated the decision was based on

"several factors", yet did not specify anything other than the video evidence. (See Exhibit 12

– June 19, 2017 Letter from Carolyn Livingston to Plaintiff).

## <u>COUNT I</u>
## Declaratory Judgment – Title IX

210.   Plaintiff repeats and realleges paragraphs 1 through 209 as if fully set forth herein.

211.   Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688, and the

regulations promulgated thereunder require a school receiving federal funds to "adopt and

publish grievance procedures providing for the prompt and equitable resolution of student . .

. complaints alleging any form of sexual harassment, including sexual assault.[30]  These

procedures must "accord[ ] due process to both parties involved . . . ."[31]

---

[30]      34 C.F.R. § 106.8(b)
[31]      2001 Guidance at 20.

212.    Upon information and belief, Defendant receives federal funds and must comply with

Title IX.

213.    The "prompt and equitable" procedures that a school must implement to "accord due

process to both parties involved" must include, at a minimum: (a) "[n]otice . . . of the

procedure, including how complaints may be filed"; (b) "[a]dequate, reliable, and impartial

investigation of complaints"; (c) "the opportunity to present witnesses and other evidence";

and (d) "[d]esignated and reasonably prompt timeframes for the major stages of the

complaint process." A school must also ensure that all employees involved in the conduct of

the procedures have "adequate training as to what conduct constitutes sexual harassment,"

which includes "alleged sexual assaults."[32]

214.    As written, the Defendant's student disciplinary process in effect in the 2016-2017 school

year violated Title IX and the regulations thereunder, which have the force of law, including

the requirements that: the procedures comport with due process, be "prompt and equitable,"

uphold the preponderance of the evidence standard, and Defendant deliver to Plaintiff

written notice of the outcome of the investigation and the rationale therefor.

215.    Those violations include, but are not limited to, the following: (a) the lack of a

meaningful hearing process wherein Plaintiff had an opportunity to present evidence and

subject the evidence against him to any adversarial testing, (b) failure to provide Plaintiff

with written notice of the determination and the rationale therefor, (c) the lack of a

meaningful right to appeal, and (d) presuming Plaintiff's guilt by maintaining a policy that

---

[32] 2001 Guidance at 21.

required no corroboration of the allegation against Plaintiff even where the complaining

witness claimed no recollection of the events.

216.   As implemented, Defendant's student disciplinary process in effect during the 2016-2017

school year, including the Student Sexual Misconduct Resolution Process, violated Title IX

and the regulations thereunder, which have the force of law, including the requirements that

the procedures comport with due process, be "prompt and equitable," uphold the

preponderance of the evidence standard, and Defendant deliver to Plaintiff written notice of

the outcome of the investigation and the rationale therefore. Those violations, which are

described above, include, but are not limited to, the following: (a) the lack of a meaningful

hearing process wherein Plaintiff had an opportunity to present evidence and subject the

evidence against him to any adversarial testing, (b) failure to provide Plaintiff with written

notice of the determination and the rationale therefor, (c) the lack of a meaningful right to

appeal, (d) and presuming Plaintiff's guilt by maintaining a policy that explicitly states that

corroboration of the allegations against Plaintiff is unnecessary.

217.   As applied to Plaintiff, Defendant's student disciplinary process in effect during the

2016-2017 school year, including the Student Sexual Misconduct Resolution Process,

violated Title IX and the regulations thereunder, which have the force of law, including the

requirements that the procedures comport with due process and be "prompt and equitable."

Those violations which are described above, include, but are not limited to, the following: (a)

the failure to perform a threshold evaluation of the charge, including denying Plaintiff the

right to tell his side of the story; (b) the failure to conduct a "thorough, reliable and

impartial" investigation with a trained investigator; (c) the failure to set an appropriate, fair

hearing date that would have allowed Plaintiff to rely on exculpatory evidence; (d) the failure to provide fair and meaningful notice of the charges; (e) the refusal to contact witnesses identified by Plaintiff; (f) the failure to provide an unbiased disciplinary process and tribunal; (g) the failure to ensure that Plaintiff be presumed innocent and that Defendant had the burden of proof; (h) the failure to ensure that there be sufficient evidence to support the Investigator's conclusion; (i) otherwise acting to achieve a predetermined result, *i.e.*, a finding that Plaintiff committed sexual assault or some related offense.

218.    Pursuant to the provisions of 28 U.S.C. §§ 2201, 2202, and 1651, Plaintiff is entitled to (a) a declaratory judgment that Defendant's 2016-2017 student disciplinary process, including the Student Sexual Misconduct Resolution Process, as written, violated Title IX (including its due process requirements); (b) a declaratory judgment that the Defendant's student disciplinary process as implemented, violated Title IX (including its due process requirements); (c) a declaratory judgment that Defendant's student disciplinary process as applied to Plaintiff, violated Title IX (including its due process requirements); and (d) further necessary or proper relief.

## **COUNT II**
### **Violation of Title IX – Erroneous Outcome from a Flawed Proceeding**

219.    Plaintiff repeats and realleges paragraphs 1 through 218 as if fully set forth herein.

220.    Title IX prohibits discrimination on the basis of sex in a school's "education program or activity," which includes all of the school's operations.

221.    Upon information and belief, Defendant receives federal funds and must comply with Title IX.

222.   A victim of discrimination based on his or her gender has, under Title IX, a private right of action against the offending school for monetary damages and equitable relief.

223.   As set forth above, Defendant engaged in a series of rushed actions that ultimately resulted in the erroneous finding that Plaintiff committed sexual assault. This represents disparate treatment of Plaintiff by Defendant on the basis of his sex.

224.   As fully set forth above, there were significant evidentiary weaknesses underlying Defendant's finding, including:

   a.   The absence of any evidence Jane Doe objected to the sexual contact,

   b.   Failure to fully interview all witnesses, ask appropriate relevant question, and present all relevant evidence in the investigator's report,

   c.   Potential bias and interest in finding the Plaintiff responsible to show compliance with Title IX,

   d.   No opportunity to question Jane Doe regarding the allegations,

   e.   No opportunity to view all the evidence, particularly exculpatory evidence,

   f.   Unnecessary haste in reaching a conclusion despite the federal government removing the 60-day timeline for completing investigations, with Plaintiff told by Amy Sillanpa that the process had to be "wrapped up prior to the end of the term",

   g.   Failure of investigation to take into consideration Jane Doe's state of mind in making the allegations and whether they were instigated by her regret and/or friends' retaliatory urging to report or in order to avoid consequences of underaged drinking, and whether she was biased against Plaintiff because of his race,

225.    In addition to the lack of evidence against Plaintiff, there were, as set forth above,

numerous procedural flaws that affected the proof, including the lack of an appropriate

investigation by a properly trained and unbiased investigator; the refusal to provide Plaintiff

with a hearing wherein he could actually contest the allegations against him, the prohibition

on Plaintiff being allowed to conduct his own investigation or contact any potential witness,

the presumption of guilt applied to Plaintiff from the outset, and the impermissible shifting

of the burden of proof to Plaintiff.

226.    The erroneous outcome of the hearing and purported appeal can only be explained by

gender bias against males in cases involving allegations of sexual assault. This bias is

reflected in the patterns of decision making by Defendant throughout the entire process and

by the biased training agents of which Defendant received.

227.    Moreover, upon information and belief, in all, or in virtually all, cases of campus sexual

misconduct at Carleton College, the accused student is male and the accusing student is

female. Defendant has created an environment in which it is impossible for a male accused

of sexual assault to receive the due process guaranteed by Title IX and the US Constitution.

This significant gender-based statistical disparity demonstrates the existence of

discrimination. In fact, Defendant impermissibly presumes male students "guilty until proven

innocent" based on invidious gender stereotypes and has codified this by policy.  (See

Exhibit 6, 7).

228.    There are at least four causes for this discriminatory environment at Carleton College.

First, acquittal of an accused male student carries the threat that the Department of

Education's Office for Civil Rights could institute an investigation that would result in

Defendant's loss of federal funding. There could also be a civil suit filed by the female complainant, a type of suit that garners much more publicity than a suit by the accused and convicted male student.

229.    Second, Defendant's officials in charge of or involved in the disciplinary process are not thinking about justice, individual rights, or their obligations to provide a fair and equitable procedure in accordance with due process guarantees; rather, they are thinking what would be most expedient for them in their professional roles.

230.    Third, these officials also focus on what would be most expedient for Carleton College and, in particular, avoiding publicity that could harm its image and brand, and hinder its efforts to attract tuition-paying students, particularly in light of the criticism it received related to its handling of a priest professor accused of sexual assault. The safer course for these officials is to convict all accused male students rather than face the negative publicity associated with decisions such as those made in the Madeline Wilson case at nearby St. Olaf. Further evidence of this arose in the fact that 13 students in charge of the hazing event were immediate suspended without a hearing due to media coverage, but later, 12 of the 13 had their suspensions quietly overturned.

231.    Fourth, Defendant's officials are susceptible to internal and external pressures, including efforts by those who wish to change the so-called "campus rape culture" at the expense of the individual rights of the accused male students.  Defendant and its officials have plainly embraced this view, and the misandry it embodies. The resulting bias is obvious in the Student Sexual Misconduct Resolution Process.

232.     The September 2017 Q&A reaffirms the vitality of the 2001 Guidance and is OCR's

latest interpretation of Title IX as it relates to sexual assault proceedings on campus. As set

forth in the Letter, OCR states that compliance with Title IX requires the following:

a.   A school's "Title IX coordinator [the official charged with compliance] should review

the [school's] disciplinary procedures to ensure that the procedures comply with the

prompt and equitable requirements of Title IX."[33]

b.   **Although a school may need to delay temporarily the fact-finding portion of a**

**Title IX investigation while the police are gathering evidence**, once notified that

the police department has completed its gathering of evidence . . . , the school must

promptly resume and complete its fact-finding for the Title IX investigation."[34]

c.   The complainant and the accused student "**must have an equal opportunity to**

**present relevant witnesses and other evidence**."[35]

d.   The complainant and the accused student "must be afforded similar and timely access

to any information that will be used at the hearing. For example, a school should not

conduct a pre-hearing meeting during which only the [complainant] is present and

**given an opportunity to present his or her side of the story**, unless a similar

meeting takes place with the [accused student]."[36]

e.   "**Schools must maintain documentation of all proceedings**, which may include

written findings of fact, **transcripts, or audio recordings**."[37]

---

[33]     *Id.* at 8.
[34]     *Id.* at 10 (emphasis added) (footnote omitted).
[35]     *Id.* at 11 (emphasis added).
[36]     *Id.* (emphasis added).
[37]     *Id.* at 12 (emphasis added).

f.   "[S]chools [should] provide an appeals process."[38]

g.   "In sexual violence cases, the fact-finder and decision-maker also should have **adequate training or knowledge regarding sexual violence**."[39]

h.   "If an investigation or hearing involves forensic evidence, that evidence should be reviewed by a **trained forensic examiner**."[40]

233.   The conclusion of the investigative process can only be explained by gender bias and an improper process. Plaintiff, based solely on his gender, suffered an erroneous outcome of the disciplinary process. This unlawful discrimination by Defendant, in violation of Title IX proximately caused Plaintiff to sustain substantial injury, damage, and loss, including, but not limited to: mental anguish; severe emotional distress; injury to reputation; past and future economic loss; deprivations of due process; loss of educational opportunities; and loss of future career prospects.

### COUNT III
**Negligence**

234.   Plaintiff repeats and realleges paragraphs 1 through 233 as if fully set forth herein.

235.   Having put in place a student disciplinary process, including the Student Sexual Misconduct Resolution Process, Defendant owed a duty of care to Plaintiff and others to conduct that process in a non-negligent manner and with due care to avoid arbitrarily dismissing students.

---

[38]   *Id.*
[39]   *Id.* (emphasis added).
[40]   *Id.* (emphasis added).

236.   The conduct of Defendant and its agents fell below the applicable standard of care and

amounted to breaches of the duty of due care and incompetence. This conduct included, but

was not limited to, implementing its Policy in a manner that is biased on the basis of gender,

failing to proceed with a presumption of innocence, and failing to implement the policy in a

manner that would result in a fair process, tilted to favor a particular outcome by not having

a fair and neutral fact finder.

237.   These breaches of the duty of due care caused Plaintiff, in fact and proximately, to

sustain substantial injury, damage, and loss, including, but not limited to: mental anguish;

loss of trust; severe emotional distress; injury to reputation; past and future economic loss;

deprivations of due process; loss of educational opportunities; and loss of future career

prospects.

## COUNT IV
### Title VI, 42 U.S.C. § 2000d

238.   Plaintiff repeats and realleges paragraphs 1 through 237 as if fully set forth herein.

239.   42 U.S.C. § 2000d, commonly referred to as Title VI, and its implementing regulations

prohibit discrimination in a federally-funded school on the basis of a student's race.

240.   Plaintiff was subjected to harassment, discrimination, and disparate treatment on the basis

of his race when he was removed from Carleton College on the basis of allegations that did

not result in the removal of similarly situated Caucasian students.

241.   Carleton College intentionally, willfully, and without justification acted to deprive

Plaintiff of this rights, privileges and immunities secured to him by the laws of the United

States.

242.   Carleton College, despite knowledge and adequate opportunity to learn of its misconduct failed to take action to remedy the harassment, discrimination, and disparate treatment of Plaintiff.

243.   As a result of Carleton College's conduct, customs, policies, and practices, Plaintiff was unjustly and discriminatorily deprived of equal education opportunities and benefits.

## COUNT V
## Minnesota Human Rights Act, § 363A.13

244.   Plaintiff repeats and realleges paragraphs 1 through 243 as if fully set forth herein.

245.   Minn. Stat. § 363A.13 prohibits discrimination on the basis of, but not limited to, race, color, creed, and national origin in any educational institution.

246.   As such, Carleton College had a duty to provide Plaintiff with an educational atmosphere free of racial discrimination.

247.   Defendant failed to take adequate steps to provide Plaintiff with an educational atmosphere free of racial discrimination.

248.   As a result of Carleton College's conduct, customs, policies, and practices, Plaintiff was unjustly and discriminatorily deprived of equal education opportunities and benefits.

## RELIEF REQUESTED

WHEREFORE, plaintiff prays for judgment against defendant, jointly and severally, and asks this Court to:

1. issue a judgment that (a) declares the Defendant's student disciplinary process, including the Student Sexual Misconduct Resolution Process, as written, as implemented, and as applied to Plaintiff, to be in violation of Title IX, including its due process requirements; (b)

requires Defendant to expunge the entire disciplinary proceeding from its records; (c) declares Defendant's conduct to be wrongful, willful, intentional, and reckless; (d) prohibits Defendant from referencing Plaintiff's disciplinary proceeding in the event of any third-party inquiry; and (e) declares that upon any third-party inquiry, Plaintiff may reply in the negative as to any question as to whether he has been accused of sexual misconduct or as to any similar question.

2. award plaintiff compensatory damages in an amount to be determined at trial, but not less than $75,000.00 for mental anguish, loss of trust, severe emotional distress, serious mental injury, injury to reputation, past and future economic loss, deprivations of due process, loss of educational opportunities, loss of future career prospects, and other injuries proximately caused by the wrongful conduct of defendant;

3. award plaintiff his attorney's fees, disbursements, and costs pursuant to the provisions of 42 U.S.C. § 1988(b) (relating to Title IX); or pursuant to any other statute or common law doctrine providing for the award of attorney's fees, disbursements, and/or costs;

4. award prejudgment interest; and grant such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury of all claims so triable.

Dated: 6/19/2019

_____
John Doe

Dated: 7-16-19

**MCGRAW LAW FIRM, P.A.**

_____
Beau D. McGraw, I.D. No.: 31190X
Attorney for Plaintiff
10390 39th Street North, Suite 3
Lake Elmo, MN 55042
Telephone: (651) 209-3200
beau@mcgrawlawfirm.com