UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Taariq Vanegas,

     Plaintiff,      Court File No. 19-cv-1878 (MJD/LIB)

  v.           **REPORT AND RECOMMENDATION**

Carleton College,

     Defendant.

---

   This matter comes before the undersigned United States Magistrate Judge upon Defendant's Motion to Dismiss Plaintiff's Complaint. [Docket No. 17]. Defendant's Motion was referred to the undersigned by the Honorable Michael J. Davis. (Order of Referral [Docket No. 23]). The Court held a Motion Hearing on December 9, 2019. (Minute Entry [Docket No. 30]).

   For the reasons discussed herein, the Court recommends that Defendant's Motion to Dismiss Plaintiff's Complaint, [Docket No. 17], be **GRANTED in part and DENIED in part.**

## I. BACKROUND AND STATEMENT OF ALLEGED FACTS[1]

### A. The Incident

   Plaintiff Taaruq Vanegas ("Plaintiff") "is of mixed race" and "was a full-time student at Carleton College in Spring 2017." (Am. Compl. [Docket No. 28] ¶ 2). Defendant Carleton College ("Defendant") "is a private, liberal arts college" located in Northfield, Minnesota. (Id. ¶¶ 3, 8). During the 2016–2017 academic year, Defendant received federal funding from the United States Department of Education. (Id. ¶ 9).

---

[1] Unless indicated otherwise, the facts in this section come from the allegations within Plaintiff's Amended Complaint. [Docket No. 28].

"On or around April 23, 2017, Plaintiff received an email containing language about 'a tradition of excellence' and an invitation to a meeting on campus set to take place at 2:00 a.m. on April 28, 2017." (Id. ¶ 35). The email informed Plaintiff that, "if he wanted to take part, he was to meet at the Japanese Pagoda on campus at 2:00 a.m.," and instructed him "not to speak to anyone about the message." (Id.).

"Plaintiff arrived at the Japanese Pagoda," at the specified time, "where a number of people had gathered and a box of alcoholic beverages awaited." (Id. ¶ 37). Several masked upperclassman were also there, "who told the invitees they were being invited to join a secret group (DTX)." (Id. ¶ 38). At the Japanese Pagoda, Plaintiff and most of the others consumed alcohol. (Id. ¶ 39).

The "initiates" proceeded to several more locations, and consumed alcohol at each. (Id. ¶¶ 40–50). Between locations, "Jane Doe approached Plaintiff and introduced herself." (Id. ¶ 54). "Plaintiff stated that he did not believe he had seen Jane Doe on campus before, and Jane Doe explained that she had not been on campus much as she had gone to study abroad twice." (Id. ¶ 55). Ms. Doe accompanied Plaintiff towards the next location, and they talked about various topics. (Id. ¶¶ 56–62).

As Plaintiff and Jane Doe walked together, Jane Doe twice stopped Plaintiff and began kissing him. (Id. ¶¶ 63–66). "Jane Doe suggested she and Plaintiff find somewhere to sit," and they went to a Park where they kissed more. (Id. ¶¶ 68–69). "Plaintiff then said that he felt uncomfortable doing what they were doing in the middle of the park and Jane Doe suggested that they go to Plaintiff's dorm room, which was closer than hers." (Id. at 70).

Plaintiff and Jane Doe proceeded to Plaintiff's dorm. (Id. at 71). They "entered Plaintiff's room, where they sat on the couch, making out." (Id. ¶ 79). "After some time," Plaintiff left to use the restroom, taking a cup that he filled with water. (Id. ¶¶ 80–81). When Plaintiff returned, he and

Jane Doe sat on the couch and shared the water. (<u>Id.</u> ¶¶ 81–82). Plaintiff said he needed to leave soon for his morning football workout, and "Jane Doe stated that was 'okay.'" (<u>Id.</u> ¶¶ 82–83).

They began kissing again, then helped each other undress. (<u>Id.</u> ¶¶ 83–84). "When Plaintiff and Jane Doe finished removing their clothes, Jane Doe said she was on birth control, but said Plaintiff should get a condom." (<u>Id.</u> ¶ 85). Plaintiff got a condom and returned to the couch. (<u>Id.</u> ¶ 86). "Before starting, Plaintiff checked with Jane Doe and asked if she was certain that she wanted to have sex and was comfortable with doing it." (<u>Id.</u> ¶ 87). "Jane Doe responded by saying 'Yes I am', to which Plaintiff responded, 'Are you sure? I want to make sure we are on the same page.' Jane Doe giggled and said 'Yes I am'." (<u>Id.</u> ¶ 88). "Plaintiff then put on a condom and penetrated Jane Doe." (<u>Id.</u> ¶ 89).

Jane Doe enthusiastically participated in the intercourse. (<u>Id.</u> ¶¶ 91–96). "While Jane Doe was on top of Plaintiff," Plaintiff's roommate knocked on the door and told Plaintiff "they had to be at workouts in 10 to 15 minutes." (<u>Id.</u> ¶ 98).

Plaintiff told Jane Doe he needed to leave and she responded "No problem, it's fine." (<u>Id.</u> ¶ 100). Plaintiff "told Jane Doe that she was welcome to stay as long as she wanted and if she wanted, she could use any of Plaintiff's clothes." (<u>Id.</u> ¶ 102). "Jane Doe responded, 'Aw thanks. That's nice of you,'" before standing up and kissing Plaintiff before he left. (<u>Id.</u> ¶ 103). "At the workout, Plaintiff vomited during warmups." (<u>Id.</u> ¶ 104).

"Approximately one minute after Plaintiff left his room, according to video evidence, Jane Doe left his room wearing one of Plaintiff's shirts." (<u>Id.</u> ¶ 105). Jane Doe wondered the hall looking for a bathroom, went upstairs to the next floor, and entered a room. (<u>Id.</u> ¶¶ 106–07). The male students to whom the room belonged "called campus security to get Jane Doe." (<u>Id.</u> ¶¶ 109–11).

Security Officer Steven Hanson arrived, determined "that Jane Doe was intoxicated based on her slurred speech and not knowing where the rest of her clothes were," and contacted the on-call area director, Taylor Morgan. (Id. ¶¶ 115–17). Together, Hanson and Morgan drove Jane Doe to her dorm. (Id. ¶ 121). After Jane Doe's roommate "indicated she had to leave for class soon," Hanson decided "to call for an ambulance to have Jane Doe's condition assessed." (Id. ¶¶ 123–24).

As they waited for the ambulance, Security Officer Hanson asked Jane Doe if she had been assaulted, she "stated that she had not been assaulted and must have entered the wrong room." (Id. ¶ 125). When asked why she was in the dorm and not wearing pants, "Jane Doe explained she might have been in that dorm because she wanted to hook up with someone there." (Id. ¶ 126). Jane Doe then began to vomit. (Id. ¶ 127). Jane Doe was brought to the hospital and was given IV fluids then discharged home. (Id. ¶¶ 129–30).

Plaintiff returned to his dorm room and found Jane Doe's clothes and belongings, he obtained her number, texted her, and informed her that he had her items and that she could pick them up any time. (Id. ¶¶ 131–36). Plaintiff was not there when Jane Doe picked up her belongings. (Id. ¶ 137). She texted him and asked if they had sex and if they used a condom. (Id. ¶ 139–40). Plaintiff said they did. (Id.).

**B.  Report & Investigation**

After sobering up, Jane Doe began to feel "she had been dangerously intoxicated, and started to get scared after talking with her friends, who felt she might have been raped." (Id. ¶ 142). Around 10:30 p.m. on April 28, 2017, Jane Doe met with security officers and other school personnel, including Title IX Deputy Laura Haave ("Haave") who "was appointed to be Jane Doe's

support person during these proceedings." (Id. ¶¶ 143–44). "Jane Doe asked if she would face discipline for underage drinking." (Id. ¶ 143).

"About 20 minutes after this meeting ended, Jane Doe called campus security and asked for a ride to the hospital for a sexual assault evaluation." (Id. ¶ 146). At the hospital, Jane Doe "underwent a sexual assault examination" and "explained that after she sobered up and talked to some people, including discussions via Facebook, she felt there were issues with the 'informed consent' to having sex." (Id. ¶¶ 147, 149). "The Facebook discussions that led to Jane Doe's decision were never submitted as evidence in this matter." (Id. ¶ 148). "Campus security forwarded their reports to Title IX coordinator Amy Sillanpa" ("Sillanpa"). (Id. ¶ 150).

On May 3, 2017, Plaintiff received an email from Sillanpa that stated a mutual no-contact order between Plaintiff and Jane Doe had been issued by Defendant and informed Plaintiff of locations he could not be on campus. (Id. ¶ 151).

On May 10, 2017, Plaintiff received another email from Sillanpa informing Plaintiff that Jane Doe had filed a sexual misconduct complaint against him, that he was to attend a meeting with Sillanpa where he was expected to answer questions about the allegation, and that "he would meet with Mary Dunnewold, 'our college investigator'" ("Dunnewold"). (Id. ¶¶ 153–55).

Dunnewold is a Title IX Deputy at Defendant college and has a major in women's studies from St. Olaf. (Id. ¶ 156). "Dunnewold's training materials to students consists of examples of male perpetrators deemed responsible for sexual misconduct for engaging in sexual intercourse with a female complainant under a variety of circumstances," which "is consistent with [Defendant's] evidentiary exams as indicated by a SANE Nurse website, which presumes students seeking evidentiary exams will be female by stating 'SANE Nurses are all female, and are on-call 24 hours a day.'" (Id. ¶¶ 157–58).

On May 16, 2017, Plaintiff, accompanied by his attorney, met with Dunnewold. (Id. ¶ 160). Plaintiff was asked "to explain what happened on the night in question." (Id.). Plaintiff was also presented with video footage that he was asked to explain. (Id. ¶¶ 160–61). When Plaintiff stated that he would like to add to the report that Jane Doe was the aggressor, Dunnewold stated "I will take none of that." (Id. ¶ 162). Plaintiff explained that although he and Jane Doe had both been drinking, she was coherent and he had no reason to believe she was incapacitated. (Id. ¶ 166).

On May 19, 2017, Plaintiff met with investigators from the Northfield Police Department and provided the same details that had already been provided to Dunnewold. (Id. ¶¶ 168–69). Plaintiff was charged with third-degree criminal sexual conduct on July 17, 2017. (Id. ¶ 177). Through the criminal discovery process, Plaintiff learned that Defendant had provided evidence to law enforcement which had not been included it in Defendant's Investigation Report or the materials provided to Plaintiff. (Id. ¶ 178). The evidence included: "[v]ideo evidence that contradicted Jane Doe's account of her physical state while awaiting EMT assistance;" "[a]udio evidence of Jane Doe's conversation with campus security;" and "[e]vidence that Jane Doe asked campus security if she would face discipline for underage drinking" and whether "she would not face discipline if it was part of a sexual assault claim." (Id.). Plaintiff also learned "[t]hat Security Director Romenesko's supplement was missing from the initial Security Report used at the school's hearing." (Id.). "Plaintiff was never notified of the existence of this evidence during the course of Defendant's proceedings against him." (Id. ¶ 179). "The [criminal] charges against Plaintiff were dismissed by the prosecution in August 2018." (Id. ¶ 182).

### C. Disciplinary Proceedings

In a letter dated May 19, 2017, Plaintiff was informed that "Sillanpa had reviewed the Investigative Report and had concluded that there was sufficient information to charge Plaintiff

with a violation of the Sexual Misconduct Policy," and that if Plaintiff did not accept responsibility a hearing would be held on May 31, 2017. (Id. ¶¶ 183–84). "Plaintiff was also informed that he would be allowed to see the Investigative Report after 2:00 p.m. on Monday, May 22, 2017, and that he would be allowed to submit, in writing, challenges to the Report, which may or may not be considered." (Id. ¶ 185).

"Plaintiff was not allowed to hear the recordings upon which Investigator Dunnewold's version of events were based" (Id. ¶ 186). Plaintiff later learned that the Investigative Report presented partial evidence, including partial text messages, and omitted witness impeachment evidence that contradicted witness testimony. (Id. ¶¶ 187–88).

On May 25, 2017, Plaintiff, accompanied by his attorney, met with Sillanpa and was informed that at the hearing he "would not be able to introduce questions" or present witnesses. (Id. ¶ 190–91). "At that meeting, Plaintiff also inquired whether Jane Doe submitting an article to the Carleton College CLAP accusing Plaintiff of sexual assault was considered retaliation," and he "was informed that it was not considered retaliation because it did not mention [Plaintiff's] name." (Id. ¶¶ 192–93). However, two students interviewed by Dunnewold "said they knew what happened because of the CLAP article," and "Plaintiff had been told not to attend an upcoming lacrosse social event because of the article." (Id. ¶ 193).

On May 31, 2017, the hearing took place before the Community Board of Sexual Misconduct ("CBSM"). (Id. ¶ 194). Jane Doe testified from a separate room. (Id. ¶ 195). Plaintiff was allowed to hear the testimony but was "not allowed to ask any questions" or "present any evidence other than his text conversation with Jane Doe." (Id. ¶¶ 195–96). "Plaintiff did submit an article from the National Institute of Health," which "was submitted to explain why Jane Doe could not remember what happened while blacked out even though she remained capable of rational

thought and conversation during her interactions with Plaintiff." (Id. ¶ 197). During Jane Doe's rebuttal she "attempted to introduce an alleged anonymous complaint against Plaintiff from a second student without any evidence," and "[d]uring Plaintiff's rebuttal, he clarified certain allegedly incriminating statements." (Id. ¶¶ 198–99).

"After deliberation, the panel found Plaintiff responsible," and Sillanpa informed Plaintiff that "the CBSM had found he committed sexual misconduct and had recommended that he be suspended for three (3) terms." (Id. ¶¶ 200–01).

On June 2, 2017, Plaintiff received a letter from Sillanpa explaining that he had been found responsible for committing sexual misconduct and informing him of his ability to appeal the determination. (Id. ¶ 203).

"On June 9, 2017, Plaintiff submitted an appeal of the CBSM panel decision and sanctions imposed," arguing that the procedure used did not meet Department of Education requirements and resulted in procedural errors that substantially impacted the decision, the CBSM did not have all of the relevant evidence, and the sanction was inconsistent with the seriousness of the offense. (Id. ¶¶ 204–05). "Prior to initiating his appeal, Plaintiff requested that he have access to the actual audio recordings of witness statements," and the request was denied. (Id. ¶¶ 206–07). Jane Doe also appealed, arguing the suspension was not sufficient punishment and "did not send a strong enough message to the campus community." (Id. at 208).

On June 19, 2017, Dean of Students Carolyn Livingston denied Plaintiff's appeal, granted Jane Doe's appeal, and amended Plaintiff's punishment to permanent expulsion. (Id. ¶ 209). Dean Livingston stated that "the evidence showed that '[Jane Doe] was clearly incapacitated,'" and "[t]he fact that [Plaintiff] continue[d] to assert that it was acceptable to engage in sexual activity with a person in [Jane Doe's] condition is deeply troubling and shows that [Plaintiff's] continued

attendance at [Defendant college] would pose a danger not only to her, but other members of the community as well." (Id.).

### D.  Plaintiff's Complaint

On July 17, 2019, Plaintiff filed his Complaint, alleging five causes of action against Defendant.[2] [Docket No. 1]. Count I seeks a Declaratory Judgment that "Defendant's student disciplinary process in effect in the 2016–2017 school year violated Title IX and the regulations thereunder" as written, as implemented, and as applied. (Am. Compl. [Docket No. 28] ¶¶ 210–18). Count II asserts a claim under Title IX for "Erroneous Outcome from a Flawed Proceeding." (Id. ¶¶ 219–33). Count III asserts a claim for negligence. (Id. ¶¶ 234–237). And Counts IV and V assert claims under Title VI and the Minnesota Human Rights Act ("MHRA") alleging that Plaintiff "was subjected to harassment, discrimination, and disparate treatment on the basis of his race" and that Defendant "failed to take adequate steps to provide Plaintiff with an educational atmosphere free of racial discrimination." (Id. ¶¶ 238–48).

## II.   DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT [Docket No. 17]

On September 20, 2019, Defendant filed the present Motion to Dismiss Plaintiff's Complaint. [Docket No. 17]. Defendant seeks an Order of this Court dismissing Plaintiff's Amended Complaint for failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6). (Id.).

---

[2] On October 31, 2019, Plaintiff filed an Amended Complaint. [Docket No. 28]. However, Plaintiff's Amended Complaint was in response to an October 25, 2019, Order of this Court requiring Plaintiff to file an Amended Complaint identifying himself by his true name without the use of the John Doe pseudonym. (Order [Docket No. 27]). At the Motion Hearing, Plaintiff confirmed that the only difference between his original Complaint and the Amended Complaint was the name by which Plaintiff identifies himself, and there were no substantive changes. (December 9, 2019, Motion Hearing, Digital Record at 1:36).

### A.  Standard of Review

To state a cause of action that will survive a Rule 12(b)(6) motion, a complaint must allege a set of facts, which, if proven true, would entitle the plaintiff to legal redress against the named defendants under an established legal theory. Martin v. Aubuchon, 623 F.2d 1282, 1286 (8th Cir. 1980). In short, "the complaint must allege facts, which if true, state a claim as a matter of law." Id. "[A] district court generally may not consider materials outside the pleadings. It may, however, consider some public records, materials that do not contradict the complaint, or materials that are 'necessarily embraced by the pleadings.'" Noble Sys. Corp. v. Alorica Cent., LLC, 543 F.3d 978, 982 (8th Cir. 2008) (citations omitted). When deciding a Rule 12(b)(6) motion to dismiss, a court must accept all facts alleged in the complaint as true and construe all reasonable inferences from those facts in the light most favorable to the complainant. Id.; Morton v. Becker, 793 F.2d 185, 187 (8th Cir. 1986). In doing so, however, a court need not accept as true wholly conclusory allegations, Hanten v. Sch. Dist. of Riverview Gardens, 183 F.3d 799, 805 (8th Cir. 1999), or legal conclusions drawn by the pleader. Westcott v. City of Omaha, 901 F.2d 1486, 1488 (8th Cir. 1990).

To survive a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). Although a complaint need not contain "detailed factual allegations," it must contain facts with enough specificity "to raise a right to relief above the speculative level." Ashcroft v. Iqbal, 556 U.S. 662, 555 (2009). When courts undertake the "context-specific task" of determining whether a plaintiff's allegations "nudge" its claims against a defendant "across the line from conceivable to plausible," they may disregard legal conclusions that are couched as factual allegations. See, Iqbal, 556 U.S. at 678–81. Although the factual allegations in the complaint need not be detailed, they must be sufficient to "raise a right to relief above the speculative level," which "requires more than labels

and conclusions, and a formulistic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555.

### B. Analysis

#### i. Count I: Declaratory Judgement

In Count I, Plaintiff seeks a Declaratory Judgment that "Defendant's student disciplinary process in effect in the 2016–2017 school year violated Title IX and the regulations thereunder as written, implemented, and applied. (Am. Compl. [Docket No. 28] ¶¶ 210–18). As explained below, Defendant's claim fails as a matter of law.

"[T]here is no private right of action to enforce grievance procedures and other regulations under Title IX." Doe v. St. John's Univ., No. 17-2413 (PAM/LIB), 2017 WL 4863066, at *3 (Oct. 26, 2017) (quoting Doe v. Univ. of St. Thomas, 240 F. Supp. 3d 984, 989 (D. Minn. 2017)). No private right of action exists because "a university's failure to promulgate a grievance procedure that complies with Title IX 'does not itself constitute "discrimination" under Title IX.'" Id. (quoting Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 292 (1998)). "Because there is no private right of action, the Declaratory Judgment Act cannot be used as an independent cause of action . . . ." Univ. of St. Thomas, 240 F. Supp. 3d at 989; see also, Doe v. Blake Sch., 310 F. Supp. 3d 969, 981–82 (D. Minn. 2018) ("The Declaratory Judgments Act is not an independent source of federal jurisdiction.").

Therefore, Count I of Plaintiff's Amended Complaint fails to state a claim upon which relief can be granted. See, St. John's Univ., 2017 WL 4863066, at *3 (dismissing the plaintiff's claim seeking a declaratory judgment that the defendant violated Title IX regulatory requirements because no private right of action existed); Univ. of St. Thomas, 240 F. Supp. 3d at 989 (same); cf., In re Doe v. Saint Paul Conservatory for Performing Arts, 17-5032 (DWF/FLN), 2018 WL

2431849, at *3 (D. Minn. May 30, 2018) (finding proposed claims alleging the defendant violated Title IX regulatory requirements were futile because no private right of action existed); <u>Blake Sch.</u>, 310 F. Supp. 3d at 981–82 (rejecting the plaintiff's claim seeking a declaratory judgment that the defendant's "disciplinary process as written and applied to [the plaintiff] violate[d] Title IX" because no private right of action existed).

For the foregoing reasons, the Court recommends that Count I be **dismissed with prejudice**.[3]

### ii.   Count II: Title IX—Erroneous Outcome from a Flawed Proceeding

"As a general rule, Title IX is not an invitation for courts to second-guess disciplinary decisions of colleges or universities." <u>Univ. of St. Thomas</u>, 240 F. Supp. 3d at 989. "And Title IX should be construed to give '[s]chool administrators . . . the flexibility they require' to initiate a reasonable disciplinary response." <u>Id.</u> at 990 (alteration in original) (quoting <u>Davis ex rel. LaShonda D. v. Monroe Cty. Bd. Of Educ.</u>, 526 U.S. 629, 648–49 (1999)).

"To allege a claim that a disciplinary proceeding reached an erroneous outcome on the basis of sex discrimination, a plaintiff must plausibly plead both facts that cast doubt on the outcome of the proceeding and 'a causal connection between the flawed outcome and gender

---

[3] "[T]he Eighth Circuit and this Court generally favor dismissals under Rule 12(b)(6) without prejudice, at least where there is no evidence of persistent pleading failures." <u>Oberg v. Shapiro</u>, No. 15-cv-3678 (PJS/SER), 2016 WL 4501354, at *12 (D. Minn. Aug. 1, 2016), report and recommendation adopted by 2016 WL 4497754 (D. Minn. Aug. 26, 2016) (quoting <u>Holmseth v. E. Grand Forks</u>, No. 14-2970 (DWF/LIB), 2015 WL 4488424, at *20 (D. Minn. July 23, 2015)). Nonetheless, when a complaint is so deficient or defective that the court is convinced that its defects cannot be cured through re-pleading, dismissal with prejudice is appropriate. <u>See</u>, <u>McLean v. United States</u>, 566 F.3d 391, 400 (4th Cir. 2009) ("[T]o the extent . . . that a district court is truly unable to conceive of any set of facts under which a plaintiff would be entitled to relief, the district court would err in designating [a] dismissal to be without prejudice. Courts, including this one, have held that when a complaint is incurable through amendment, dismissal is properly rendered with prejudice and without leave to amend."); <u>McKesson HBOC, Inc. v. N.Y. State Common Ret. Fund, Inc.</u>, 339 F.3d 1087, 1096 (9th Cir. 2003) (dismissal with prejudice is appropriate where "deficiencies in [plaintiff's] claims cannot be cured by amendment"). The latter circumstance is the case here. This Court concludes that the "defects cannot be cured through re-pleading." <u>See</u>, <u>McLean</u>, 566 F.3d at 400. Accordingly, the Court recommends that Plaintiff's declaratory judgment claim be dismissed with prejudice. <u>See</u>, <u>St. John's Univ.</u>, 2017 WL 4863066, at *3, 5 (granting the defendant's 12(b)(6) motion to dismiss and dismissing the plaintiff's claim for declaratory judgment with prejudice); <u>Univ. of St. Thomas</u>, 240 F. Supp. 3d at 989, 996 (same).

bias.'" St. John's Univ., 2017 WL 4863066, at *3 (quoting Yusuf v. Vassar Coll., 35 F.3d 709, 715 (2d Cir. 1994)); accord, Univ. of St. Thomas, 240 F. Supp. 3d at 990.

"A mere allegation that a procedurally flawed proceeding led to an erroneous outcome 'combined with a conclusory allegation of gender discrimination is not sufficient to survive a motion to dismiss." St. John's Univ., 2017 WL 4863066, at *3 (quoting Yusuf, 35 F. 3d at 715; see also, Stenzel v. Peterson, No. 17-580 (JRT/LIB), 2017 WL 4081897, at *5 (D. Minn. Sept. 13, 2017) ("[M]ere allegations that a disciplinary process was unfair or failed to take into account certain information do not create an inference of gender bias sufficient for Title IX."). "[A] plaintiff must specifically allege a causal connection between the outcome and discrimination." St. John's Univ., 2017 WL 4863066, at *3. "Allegations that might suffice to show a motivating factor are things such as comments by members of the disciplinary board or other university officials evidencing gender bias, or a 'pattern[] of decision-making that . . . tend[s] to show the influence of gender.' Id. (alteration in original) (quoting Yusuf, 35 F. 3d at 715). However, "[u]niversity 'administrators are "entitled to a presumption of honesty and integrity unless actual bias . . . can be proven."'" Doe v. Univ. of St. Thomas, 368 F. Supp. 3d 1309, 1320 (D. Minn. 2019), appeal docketed (quoting Richmond v. Fowlkes, 228 F.3d 854, 858 (8th Cir. 2000)).

Here, Plaintiff makes numerous allegations regarding alleged procedural deficiencies in Defendant's investigation and disciplinary proceeding. (See, Am. Compl. [Docket No. 28]). However, because Plaintiff has failed to plausibly allege a causal connection between the allegedly flawed outcome and gender bias, it is not necessary for the Court to consider whether Plaintiff has plausibly alleged facts which cast doubt on the outcome of the proceeding. See, Does 1-2 v. Regents of the Univ. of Minn., No. 18-1596 (DWF/HB), 2019 WL 2601801, at *5–6 (D. Minn.

June 25, 2019); St. John's Univ., 2017 WL 4863066, at *3–4; Univ. of St. Thomas, 240 F. Supp. 3d at 990–93.

At the Motion Hearing, Plaintiff conceded that the only allegations in the Amended Complaint that show gender bias are paragraphs 145 and 157.[4] (December 9, 2019, Motion Hearing, Digital Record at 2:15–2:16). Plaintiff contends that these allegations plausibly allege that Haave and Dunnewold are biased against males and that their bias affected the outcome of the proceeding.

Paragraph 145 states, "Ms. Haave's online presence indicates a strong anti-male stance. (See Exhibit 3 – Haave Twitter Posts)." (Am. Compl. [Docket No. 28] ¶ 145). Exhibit 3 consists of two Twitter posts from 2015. (Ex. 3 [Docket No. 1-3]). In the first, Haave posted, "[Y]ou know what's really therapeutic when you're pissed off about sexual violence? Finely mincing a cucumber. With deadly precision." (Id.). In the second, another user's Twitter post stated, "reminder that you do NOT need to know 'what happened' to trust the word of a survivor & follow their wishes," to which Haave replied by posting, "Really needed to hear this today because of pushback for doing just that. Thank You." (Id.).

---

[4] Despite this concession, the Court notes that Plaintiff's Amended Complaint also raised several conclusory cookie-cutter allegations of gender bias. (See, Am. Compl. [Docket No. 28]). First, Plaintiff alleges that gender bias is shown because Defendant was under various internal and external pressures to find males guilty of sexual assault. (See, e.g., Id. ¶¶ 10–13, 228, 230–31). Courts in this district have consistently held that similar allegations of pressure are insufficient to establish gender bias. See, Regents of the Univ. of Minn., 2019 WL 2601801, at *3, 5; Blake Sch., 310 F. Supp. 3d at 982; Univ. of St. Thomas, 240 F. Supp. 3d at 992–93. Second, Plaintiff alleges that gender bias is established by the statistical disparity between males and females accused of sexual assault. (See, e.g., Am. Compl. [Docket No. 28] ¶ 227). Courts in this district have consistently held that similar allegations are insufficient to establish gender bias. See, St. John's Univ., 2017 WL 4863066, at *4; Univ. of St. Thomas, 240 F. Supp. 3d at 991. Third, Plaintiff alleges that the erroneous outcome of the proceeding can only be explained by gender bias. (See, e.g., Am. Compl. [Docket No. 28] ¶¶ 223, 226, 233). Courts in this district have consistently held that allegations of a flawed proceeding "do not create an inference of gender bias." Stenzel, 2017 WL 4081897, at *5; see also, Blake Sch., 310 F. Supp. 3d at 982; St. John's Univ., 2017 WL 4863066, at *4. In addition, Plaintiff argued in written briefing that "gender bias is one plausible explanation" for why Jane Doe was allegedly treated differently than Plaintiff. (See, Mem. in Opp'n [Docket No. 25], at 13). At most, however, any purportedly differential treatment indicates a bias in favor of alleged victims and/or against alleged perpetrators, which "is not the equivalent of demonstrating bias against male students." See, Stenzel, 2017 WL 4081897, at *5; see also, Regents of the Univ. of Minn., 2019 WL 2601801, at *5; Blake Sch., 310 F. Supp. 3d at 982; Univ. of St. Thomas, 240 F. Supp. 3d at 991.

Plaintiff argues that the first post "appears to be a representation of chopping up genitalia using a large knife," and that "[w]ith Defendant involving individuals with this type of attitude in the process, it is plausible that the process which resulted in Plaintiff being entirely discredited was because of gender bias." (Mem. in Opp'n [Docket No. 25], at 12).

Neither of the two Twitter posts, however, indicate a bias by Defendant against <u>male</u> students. At most, the first post indicates an employee of Defendant's bias against alleged perpetrators of sexual violence, and the second indicates a bias by that same individual in favor of alleged victims of sexual assault. (<u>See</u>, Ex. 3 [Docket No. 1-3]). However, merely "demonstrating that a university official is biased in favor of the alleged victims of sexual assault claims, and against the alleged perpetrators, is not the equivalent of demonstrating bias against male students." <u>Stenzel</u>, 2017 WL 4081897, at *5 (quoting <u>Sahm v. Miami Univ.</u>, 110 F. Supp. 3d 774, 778 (S.D. Ohio 2015)); <u>accord</u>, <u>Saint Paul Conservatory for Performing Arts</u>, 2018 WL 2431849, at *4; <u>see also</u>, <u>Regents of the Univ. of Minn.</u>, 2019 WL 2601801, at *5; <u>Blake Sch.</u> 310 F. Supp. 3d at 982; <u>Univ. of St. Thomas</u>, 240 F. Supp. 3d at 991. Therefore, Plaintiff has failed to plausibly allege that Defendant's proceedings were biased against <u>male</u> students.

More particularly, Plaintiff has failed to plausibly allege a connection between Haave and the outcome of the proceeding. Plaintiff alleges Haave was Jane Doe's "support person." (Am. Compl. [Docket No. 28] ¶ 144). At the Hearing, Plaintiff referred to Haave as Jane Doe's "advocate," however, Plaintiff explained that Defendant refers to such advocates as "advisors." (December 9, 2019, Motion Hearing, Digital Record at 2:05–2:06). Defendant's Student Sexual Misconduct Resolution Process provides that "[t]he role of an advisor is to support a student, not act as a student's representative, spokesperson, or advocate in the Resolution Process." (Ex. 2 [Docket No. 1-2], at 4). "Advisors will not be permitted to offer written or oral information to the

panel." (Am. Compl. [Docket No. 28] ¶ 34(vi)). Plaintiff has <u>not</u> alleged that Haave participated

in any way in the investigation or disciplinary proceeding beyond her role as an advisor, which

merely consisted of Haave providing Jane Doe with support. (<u>See</u>, Am. Compl. [Docket No. 28]).

Paragraph 157 states,

> Ms. Dunnewold's training materials to students consists of examples of male
> perpetrators deemed responsible for sexual misconduct for engaging in sexual
> intercourse with a female complainant under a variety of circumstances. (See
> Exhibit 6 - Carleton Voice Article "A Matter of Consent" quoting Mary
> Dunnewold; Exhibit 7 – Carleton Voice article "Locker Room Talk").[5]

(<u>Id.</u> ¶ 157). Exhibits 6 and 7 are articles which were published in a Carleton College alumni

magazine called <u>Voice</u>. (<u>See</u>, Exhibit 6 [Docket No. 1-6]; Exhibit 7 [Docket No. 1-7]). Exhibit 6

is an article called <u>A Matter of Consent</u> that was written by Thomas Rozwadowski and includes

quotes from Dunnewold about sexual misconduct at Defendant college. (<u>See</u>, Exhibit 6 [Docket

No. 1-6]). Exhibit 7 relates to "a discussion with a group of Carleton men about their role in

acknowledging and preventing sexual violence" and includes online reader commentary regarding

<u>A Matter of Consent</u>. (<u>See</u>, Exhibit 7 [Docket No. 1-7]). In Exhibit 6, Dunnewold refers to various

hypothetical scenarios with male perpetrators and female victims. (<u>See</u>, Exhibit 6 [Docket No. 1-

6]). Similarly, in Exhibit 7, males are referred to as perpetrators and females are referred to as

victims. (<u>See</u>, Exhibit 7 [Docket No. 1-7]).

However, "[i]t is a simple fact that the majority of accusers of sexual assault are female

and the majority of the accused are male . . . ." <u>St. John's Univ.</u>, 2017 WL 4863066, at 4 (quoting

<u>Austin v. Univ. of Or.</u>, 205 F. Supp. 3d 1214, 1225 (D. Or. 2016)). Given this "simple fact," the

Court cannot plausibly infer that merely depicting hypothetical scenarios with male perpetrators

---

[5] Plaintiff also alleges that Dunnewold "major[ed] in women's studies." (Am. Compl. [Docket No. 28] ¶ 156). However, majoring in women's studies does not indicate any bias against men. <u>See</u>, <u>Doe v. Miami Univ.</u>, 882 F.3d 579, 593 n.6 (6th Cir. 2018) ("Merely being a feminist, being affiliated with a gender-studies program, or researching sexual assault does not support a reasonable inference than an individual is biased against men.").

and female victims in general training materials or in an interview unrelated to the underlying proceedings in this case is indicative of a bias against men. See, Id.; see also, Doe v. Loh, No. PX-16-3314, 2018 WL 1535495, at *10 n.8 (D. Md. Mar. 29, 2018) (finding that the "use of hypothetical scenarios . . . which referenced female sexual misconduct victims and male perpetrators . . . did not give rise to the plausible inference that the [defendant's] sexual misconduct process as applied to [the Plaintiff] led to erroneous outcome due to gender bias."). Therefore, Plaintiff has failed to plausibly allege that Defendant, through Dunnewold, was biased against male students.

For the foregoing reasons, the Court recommends that Count II be **dismissed without prejudice**.[6]

### iii.   Count III: Negligence

"In Minnesota, a negligence claim requires a showing of four elements: (1) the defendant owed the plaintiff a duty of care; (2) the defendant breached that duty of care; (3) the plaintiff was injured; and (4) the defendant's breach of the duty of care was the proximate cause of the injury." Doe v. Univ. of St. Thomas, 368 F. Supp. 3d 1309, 1316 (D. Minn. 2019), appeal docketed.

Here, the Parties do not dispute that Defendant owed a duty of care to Plaintiff. Nonetheless, they disagree on what duty was owed. In Doe v. University of St. Thomas, it was recently recognized that private universities owe a duty of reasonable care in making disciplinary decisions based on student misconduct. Id. at 1316–19, 1323. The Court finds University of St.

---

[6] This Court cannot conclude that it is "truly unable to conceive of any set of facts under which [Plaintiff] would be entitled to relief." See, McLean, 566 F.3d at 400. As such, the Court cannot hold that the "defects cannot be cured through re-pleading." See, Id. Accordingly, the Court recommends that Plaintiff's Title IX claim be dismissed without prejudice. See, e.g., Stenzel, 2017 WL 4081897, at *7 (dismissing without prejudice a Title IX claim that failed to plausibly allege gender bias).

Thomas to be persuasive, if not controlling, authority. See, Id. Therefore, the Court applies a reasonable care standard in the present case.

Defendant argues, however, that even if a reasonable care standard is applied, Plaintiff has failed to plausibly allege that Defendant breached its duty. (See, Mem. in Supp. [Docket No. 19], at 25–29). "The requirements imposed by the common law on private universities parallel those imposed by the due process clause on public universities." Abbario v. Hamline Univ. Sch. of Law, 258 N.W.2d 108, 113 (Minn. 1977); accord, Univ. of St. Thomas, 368 F. Supp. 3d at 1317. "Due process is flexible and calls for such procedural protections as the particular situation demands." Univ. of St. Thomas, 368 F. Supp. 3d at 1319 (quoting Keefe v. Adams, 840 F.3d 523, 535 (8th Cir. 2016)). "What constitutes reasonable care must also be flexible." Id. Therefore, "[w]hether a given university exercised reasonable care will, like most negligence claims, depend on the circumstances of each case." Id. at 1318.

Plaintiff alleges that Defendant breached its duty of reasonable care in numerous ways, which include "implementing its policy in a manner that is biased on the basis of gender, failing to proceed with a presumption of innocence, and failing to implement the policy in a manner that would result in fair process, tilted to favor a particular outcome by not having a fair and neutral fact finder." (Am. Compl. ¶ 236). Plaintiff also alleges various ways in which Defendant's Sexual Misconduct Policy was procedurally deficient. (See, e.g., Id. at ¶¶ 178–79, 19, 196, 205, 224–25). Plaintiff's allegations of breach can be broadly summarized into three categories: (1) bias; (2) deficiencies in the Sexual Misconduct Policy; and (3) failure to reasonably implement the Sexual Misconduct Policy.

### 1.  Bias

Plaintiff alleges that Defendant breached its duty of reasonable care by implementing its Sexual Misconduct Policy in a biased manner and failing to have "a fair and neutral fact-finder." (See, e.g., Id. ¶ 236).

"When it exists, bias certainly provides some indication that a university failed to use reasonable care in conducting an investigation." Univ. of St. Thomas, 368 F. Supp. 3d at 1319; see also, R.T. v. Univ. of Minn., No. C9-01-1596, 2002 WL 1275663, at *3 (Minn. Ct. App. June 11, 2002) ("Parties to an administrative proceeding are entitled to a decision by an unbiased decision-maker."). However, "[u]niversity 'administrators are "entitled to a presumption of honesty and integrity unless actual bias . . . can be proven."'" Univ. of St. Thomas, F. Supp. 3d at 1320 (quoting Richmond Fowlkes, 228 F.3d 854, 858 (8th Cir. 2000)); see also, R.T., 2002 WL 1275663, at *3 ("Administrative proceedings are presumed to be honest and regular, and the party claiming otherwise has the burden of proof.").

As already explained in detail in Section II.B.ii above, Plaintiff has not plausibly alleged gender bias. Likewise, Plaintiff "has not provided any facts suggesting that those involved in his adjudication process were actually biased against him." See, Univ. of St. Thomas, F. Supp. 3d at 1320. Unsupported, conclusory allegations of bias are insufficient to plausibly state a claim. See, Id. at 1320–21; R.T., 2002 WL 1275663, at *3; see also, Iqbal, 556 U.S. at 678–81; Twombly, 550 U.S. at 555.

Therefore, Plaintiff has failed to plausibly allege that Defendant breached its duty of reasonable care by providing a biased fact-finder or otherwise implementing its policy in a biased manner.

## 2. Deficiencies in the Sexual Misconduct Policy

Plaintiff alleges that Defendant breached its duty of reasonable care because the procedures provided for in the Sexual Misconduct Policy were deficient in several ways. (See, e.g., Am. Compl. [Docket No. 28] ¶¶ 178–79, 191, 196, 205, 224–25, 236).

Plaintiff contends that prior to the disciplinary hearing he should have been notified of the existence of and provided with additional evidence and should have been allowed to conduct his own investigation. (See, e.g. Id. ¶¶ 178–79, 224–25). Plaintiff further contends that at the disciplinary hearing he should have been allowed to introduce questions, cross-examine Jane Doe, present witnesses, and present additional unspecified evidence. (See, e.g., Id. ¶¶ 191, 196, 224–25). Plaintiff does not allege that any of these purported deficiencies violated Defendant's Sexual Misconduct Policy.[7] Indeed, the Sexual Misconduct Policy explicitly states that the disciplinary hearing "is not intended to be an adversarial proceeding," and "[t]he hearing is not a legal process, and it is not intended to mimic or substantially duplicate a civil or criminal trial." (Am. Compl. [Docket No. 28] ¶ 34; Ex. 2 [Docket No. 1-2], at 7). The Sexual Misconduct Policy also states that "[a]t either party's request, the hearing can be setup so that the complainant and respondent will have minimal interaction during the hearing or will not be in the hearing room at the same time." (Am. Compl. [Docket No. 28] ¶ 34; Ex. 2 [Docket No. 1-2], at 9).

The duty of reasonable care requires universities "to create and administer a process that [is] fair and impartial to both parties" and "provide[s] some measure of due process in the proceeding to ensure that an accurate outcome [is] achieved." See, Univ. of St. Thomas, 368 F. Supp. 3d at 1319. In the context of public schools, due process generally requires that a student accused of misconduct be given notice of the allegations, an explanation of evidence upon which

---

[7] Even if Plaintiff had alleged such violations, however, flawless adherence to a university's policies and procedures is not required to satisfy its duty of reasonable care. See, Univ. of St. Thomas, 368 F. Supp. 3d at 1321–23.

the allegations are based, an opportunity to respond to the allegations, and an opportunity to appeal. See, Keefe, 840 F.3d at 535–36; R.T., 2002 WL 1275663, at *3. Because "[t]he requirements imposed by the common law on private universities parallel those imposed by the due process clause on public universities," due process requirements are instructive in determining what is required meet a private university's duty of reasonable care. See, Univ. of St. Thomas, 368 F. Supp. 3d at 1317 (alteration in original) (quoting Abbario, 258 N.W.2d at 113). Consequently, it is clear that the duty of reasonable care does not require a university's misconduct policy to provide the procedural protections of a trial. See, Id. at 1319.

Here, in accordance with Defendant's Sexual Misconduct Policy, Plaintiff was notified of the allegations against him, and he was informed of the evidence that formed the basis of those allegations. (See, e.g., Am. Compl. [Docket No. 28] ¶¶ 34, 153, 183, 185; Ex. 2 [Docet No. 1-2]; Ex. 5 [Docket No. 1-5]; Ex. 8 [Docket No. 1-8]; Ex. 9 [Docket No. 1-9]). Plaintiff was also provided with a disciplinary hearing at which he had the opportunity to respond to the allegations against him. (See, e.g., Am. Compl. [Docket No. 28] ¶¶ 194, 199). After he was found to have committed sexual misconduct, Plaintiff was allowed an opportunity to appeal the decision. (See, e.g., Id. ¶¶ 201, 204–05; Ex. 11 [Docket No. 1-11]; Ex. 12 [Docket No. 1-12]).

In Univ. of St. Thomas, a similar policy was found to have met the duty of reasonable care where "[t]he Policy clearly established that the Factfinders were responsible for all aspects of the investigation, that they would conduct the investigation at an arms-length from the parties, and that they would seek input from the parties only when they needed it." Id. ("[The plaintiff] seems to be under the erroneous impression that he would be able to mount something of a full defense and become intricately involved in the investigatory process."); see also, St. John's Univ., 2017 WL 4863066, at *5 (finding the plaintiff had failed to plausibly allege negligence where the

plaintiff alleged the university "fail[ed] to hold a hearing at which he could testify and confront the accuser" and prohibited him from "conducting his own investigation").

Therefore, Plaintiff has failed to plausibly allege that Defendant breached its duty of reasonable care because the procedures provided for in the Sexual Misconduct Policy were deficient.

### 3.   *Implementation of the Sexual Misconduct Policy*

Plaintiff alleges that Defendant breached its duty of reasonable care because its implementation of the Sexual Misconduct Policy was deficient in several ways. (See, e.g., Am. Compl. [Docket No. 28] ¶¶ 147–48, 162, 178, 187–88, 223–25, 236).

As with his allegations of bias, Plaintiff makes several unsupported, conclusory allegations regarding the purportedly negligent implementation of Defendant's Sexual Misconduct Policy. (See, e.g., Id. ¶¶ 224–25, 236). For example, Plaintiff alleges that Defendant "[f]ail[ed] to fully interview all witnesses" and to "ask appropriate relevant question[s]." (Id. ¶ 224). Nonetheless, Plaintiff has not identified any witness that Defendant failed to interview. (See, Id.). Nor has Plaintiff identified any relevant question that Defendant failed to ask. (See, Id.). Plaintiff also alleges that Defendant "failed to proceed with a presumption of innocence" and impermissibly shifted the burden of proof to Plaintiff. (See, Id. ¶¶ 225, 236). Yet, Plaintiff has not pleaded any factual allegations that indicate Defendant presumed his guilt or shifted the burden of proof to Plaintiff. (See, Id.). Such conclusory allegations fail to plausibly state a claim. See, Iqbal, 556 U.S. at 678–81; Twombly, 550 U.S. at 555; cf., Doe v. Univ. of Arkansas-Fayetteville, No. 5:18-CV-05182, 2019 WL 1493701, at *9 (W.D. Ark. Apr. 3, 2019) (finding at a public university that due process "does not require that the [university] track down all potential witnesses that a party believes has information in a given case," and that due process requirements were met where "[t]he

hearing panel did not place the burden of proof on either party, but based on the evidence presented before them, determined" it was "more likely than not that [the plaintiff] had violated [the university's] sexual assault policy").

However, Plaintiff also makes allegations that are supported and non-conclusory. (See, e.g., Am. Compl. [Docket No. 28] ¶¶ 147–48, 178, 187–88, 224). Plaintiff alleges that "Defendant engaged in a series of rushed actions that ultimately resulted in the erroneous finding that Plaintiff committed sexual assault." (Id. ¶ 223). Plaintiff supports this assertion with the factual allegation that Title IX coordinator Amy Sillanpa told Plaintiff "that the [disciplinary] process had to be 'wrapped up prior to the end of the term.'" (Id. ¶ 224). Plaintiff further alleges that relevant favorable evidence was not included in the Investigative Report and was not considered by the CBSM panel. (See, Id. ¶¶ 147–48, 178, 187–88, 224). Specifically, Plaintiff alleges that Jane Doe discussed the relevant events with others on Facebook prior to reporting sexual misconduct, but "[t]he Facebook discussions that lead to Jane Doe's decision were never submitted as evidence in this matter." (Id. ¶¶ 148–47). Plaintiff alleges that only partial copies of GroupMe text messages, provided by Jane Doe, had been included in the investigative report. (Id. ¶¶ 187–88). And Plaintiff alleges that certain video and audio evidence was not considered. (Id. ¶ 178).

The allegations in the present case fall short of the "plethora of errors during the disciplinary process" that were alleged in Univ. of St. Thomas. See, 240 F. Supp. 3d at 995 (denying a 12(b)(6) motion to dismiss a negligence claim arising from a student misconduct proceeding). Moreover, Plaintiff has been provided with the Investigative Report, unlike in Univ. of St. Thomas. (Id.; Ex. 9 [Docket No. 1-9]). Still, Plaintiff has raised more factual allegations than in St. John's Univ., where the plaintiff "alleged no specific facts to support his negligence claim."

2017 WL 4863066, at *5 (granting a 12(b)(6) motion to dismiss a negligence claim arising from a student misconduct proceeding).

In accepting all facts alleged in the Amended Complaint as true and construing all reasonable inferences from those facts in the light most favorable to Plaintiff, the Court finds that Plaintiff has plausibly alleged that Defendant breached its duty of reasonable care. (See, e.g., Am. Compl. [Docket No. 28] ¶¶ 147–48, 178, 187–88, 224, 236). Defendant's Sexual Misconduct Policy contemplates a "thorough and impartial investigation." (Id. ¶ 34, Ex. 2 [Docket No. 1-2], at 6). Due to Defendant allegedly conducting an unreasonably rushed investigation and hearing, it is plausible that Investigator Dunnewold and/or the CBSM panel unreasonably failed to consider evidence that was favorable to Plaintiff. (See, Am. Compl. [Docket No. 28] ¶¶ 147–48, 178, 187–88, 224, 236). Although a misconduct proceeding is not required to be flawless, the unreasonable failure to conduct a thorough investigation and/or the unreasonable failure to consider relevant evidence may in some circumstances amount to a breach of a university's duty of reasonable care. See, Univ. of St. Thomas, 368 F. Supp. 3d at 1321–23; Univ of St. Thomas, 240 F. Supp. 3d at 995; but see also, Oirya v. Brigham Young Univ., No. 2:16-cv-01121-BSJ, 2020 WL 110280, at *10 (D. Utah Jan. 9, 2020) (granting the defendant summary judgment where the university met its duty by carrying out a reasonable and fair investigation).

Therefore, Plaintiff has plausibly alleged that Defendant breached its duty of reasonable care in the implementation of its Sexual Misconduct Policy.

Having established that Defendant owed Plaintiff a duty of reasonable care and that Defendant breached that duty; Plaintiff has plausibly alleged that Plaintiff incurred damages and that those damages were proximately caused Defendant's breach. (See, e.g., Am. Compl. [Docket No. 28] ¶¶ 201, 209, 237).

For the foregoing reasons, the Court recommends that Defendant's Motion to Dismiss Plaintiff's Complaint, [Docket No. 17], be **DENIED** in reference to Count III.[8]

### iv.  Counts IV & V: Racial Discrimination

"Title VI of the Civil Rights Act of 1964 provides that '[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." Blake Sch., 310 F. Supp. 3d at 980 (alteration in original) (quoting 42 U.S.C. § 2000d). Similarly, "the MHRA provides, in relevant part: 'It is an unfair discriminatory practice to discriminate in any manner in the full utilization of or benefit from any educational institution, or the services rendered thereby to any person because of race, color, creed, religion, [or] national origin . . . .'" Id. "The MHRA is typically construed in accordance with federal precedent concerning analogous federal statutes." Id. (quoting Mumid v. Abraham Lincoln High Sch., 618 F.3d 789, 793 (8th Cir. 2010)).

"To establish the elements of a prima facie case under Title VI, a complaining party must demonstrate that his/her race, color, or national origin was the motive for the discriminatory conduct." Horde v. Elliot, No. 17-cv-800 (WMW/SER), 2018 WL 987683, at *10 (D. Minn. Jan. 9, 2018), report and recommendation adopted by 2018 WL 985294 (D. Minn. Feb. 20, 2018) (quoting Thompson v. Bd. of Special Sch. Dist. No. 1, 144 F.3d 574, (8th Cir. 1998)). A plaintiff "may do so by showing that a similarly-situated person of another race received more favorable treatment." Lucke v. Solsvig, 912 F.3d 1084, 1087 (8th Cir. 2019); accord, Regents of the Univ. of Minn., 2019 WL 2601801, at *6. "The plaintiff has the burden of locating similarly-situated comparators." Lucke, 912 F.3d at 1087. "That person must be 'similarly situated in all relevant

---

[8] In allowing Plaintiff's negligence claim to proceed, the Court makes no comments on the ultimate strength of the claim.

respects." <u>Lucke</u>, 912 F.3d at 1087 (quoting <u>Young v. Builders Steel Co.</u>, 754 F.3d 573, 577 (8th

Cir. 2014)); <u>accord</u>, <u>Regents of the Univ. of Minn.</u>, 2019 WL 2601801, at *6. "Such a showing is

necessary because a Title VI claim requires a showing that race, and not some other factor,

motivated intentional disparate treatment." <u>Regents of the Univ. of Minn.</u>, 2019 WL 2601801, at

*6.

Here, Plaintiff claims that he "was subjected to harassment, discrimination, and disparate

treatment on the basis of his race when he was removed from [Defendant college] on the basis of

allegations that did not result in the removal of similarly situated Caucasian students." (Am.

Compl. [Docket No. 28] ¶ 240). However, "a conclusory allegation of discrimination without

supporting 'facts showing that similarly situated [individuals] were treated differently' cannot

support a claim" under Title VI. <u>Blake Sch.</u>, 310 F. Supp. 3d at 980 (alteration in original) (quoting

<u>Hager v. Ark. Dep't of Health</u>, 735 F.3d 1009, 1015 (8th Cir. 2013)); <u>see</u> <u>also</u>, <u>Horde</u>, 2018 WL

987683, at *10 (finding conclusory allegations failed to state a claim under Title VI). Therefore,

to survive the present motion, Plaintiff must have plausibly alleged facts showing that (1) a

similarly-situated person, (2) of another race, (3) received more favorable treatment than Plaintiff.

<u>See</u>, <u>Lucke</u>, 912 F.3d at 1087; <u>Regents of the Univ. of Minn.</u>, 2019 WL 2601801, at *6; <u>Blake</u>

<u>Sch.</u>, 310 F. Supp. 3d at 980.

Plaintiff alleges that he "is of mixed race." (<u>See</u>, Am. Compl. [Docket No. 28] ¶ 2). Plaintiff

also alleges "that 13 students in charge of the [precipitating] hazing event were immediate [sic]

suspended without a hearing due to media coverage, but later, 12 of the 13 had their suspensions

quietly overturned." (<u>Id.</u> at ¶ 230). Plaintiff argues that these factual allegations are sufficient to

support his claims of racial discrimination. (<u>See</u>, Mem. in Opp'n [Docket No. 25], at 29–30;

December 9, 2019, Motion Hearing, Digital Record at 2:25–2:26).

Although Plaintiff specified his race, he has not alleged the race or races of the other 12 students that had their hazing related suspensions overturned. (See, Am. Compl. [Docket No. 28]). Thus, Plaintiff has failed to plausibly allege that any of the other 12 students were of a different race than Plaintiff. Moreover, Plaintiff has not alleged that any of the other 12 students were also accused of sexual misconduct.[9] (See, Id.). To have been similarly situated in all relevant respects, however, the other students must also have been charged with sexual misconduct. See, Regents of the Univ. of Minn., 2019 WL 2601801, at *7 (finding a student was not similarly situated because "no one filed a complaint against [her], let alone claimed she had participated in a sexual assault," and another student was not similarly situated because the allegations were "not sufficient to show that he engaged in the same behavior as Plaintiffs so as to make the comparison relevant."). Therefore, Plaintiff has failed to plausibly allege that the other 12 students were similarly situated.

Because Plaintiff has failed to allege that any similarly-situated person of another race was treated more favorably than him, Plaintiff has failed to plausibly state a claim for racial discrimination under an intentional disparate treatment theory. See, Lucke, 912 F.3d at 1087; Regents of the Univ. of Minn., 2019 WL 2601801, at *6; Blake Sch., 310 F. Supp. 3d at 980; Horde, 2018 WL 987683, at *10.

In addition to his intentional disparate treatment allegations, Plaintiff also claims that "Defendant failed to take adequate steps to provide Plaintiff with an educational atmosphere free of racial discrimination." (Am. Compl. [Docket No. 28] ¶ 247). However, Plaintiff has failed to raise any factual allegations indicating racial discrimination at Defendant college. (See, Am. Compl. [Docket No. 28]). Besides the allegations discussed above, the only allegation regarding race made by Plaintiff is a conclusory one that Defendant failed to consider "whether [Jane Doe]

---

[9] At the Motion Hearing, Plaintiff stated that he believed they were accused of hazing. (December 9, 2019, Motion Hearing, Digital Record at 2:25).

was biased against Plaintiff because of his race." (Id. ¶ 224). In fact, Plaintiff has alleged no facts to support an inference that Jane Doe actually was biased against him because of his race. (See, Am. Compl. [Docket No. 28]). Nor has Plaintiff alleged facts to support an inference that Jane Doe's decision to report sexual misconduct was motivated by Plaintiff's race. (See, Id.).

Therefore, Plaintiff has failed to plausibly state a claim for systemic racial discrimination at the Defendant college.

For the foregoing reasons, the Court recommends that Counts IV and V be **dismissed without prejudice**.[10]

## III.   CONCLUSION

For the foregoing reasons, **IT IS HEREBY RECOMMENDED THAT:**

1.  Defendant's Motion to Dismiss Plaintiff's Complaint, [Docket No. 17], be **GRANTED in part** and **DENIED in part** as set forth herein:

2.  Count I be **DISMISSED with prejudice**;

3.  Plaintiff's Count II be **DISMISSED without prejudice**;

4.  Plaintiff's Count III be **DISMISSED without prejudice** as to his claims that Defendant was negligent by implementing its Sexual Misconduct Policy in a biased manner, and that Defendant was negligent in creating the content and procedures of its Sexual Misconduct Policy; but that Defendant's Motion to Dismiss be **DENIED** as to Plaintiff's claim that Defendant was negligent in the timing of the investigation and the failure to include or

---

[10] This Court cannot conclude that it is "truly unable to conceive of any set of facts under which [Plaintiff] would be entitled to relief." See, McLean, 566 F.3d at 400. As such, the Court cannot hold that the "defects cannot be cured through re-pleading." Accordingly, the Court recommends that Plaintiff's racial discrimination claims be dismissed without prejudice. See, e.g., Jackson v. Metro. Council HRA Mgmt. Ass'n, No. 10-2370 (JRT/JJG), 2011 WL 1486039, at *5 (D. Minn. Mar. 18, 2011) (dismissing without prejudice a Title VI claim that failed to plausibly allege racial discrimination).

consider some evidence favorable to Plaintiff in implementing its Sexual Misconduct Policy in this case;

5. Plaintiff's Count IV be **DISMISSED without prejudice**; and

6. Plaintiff's Count V be **DISMISSED without prejudice**.

Date: February 10, 2020                  /s Leo I. Brisbois
                                         Leo I. Brisbois
                                         U.S. MAGISTRATE JUDGE

## **NOTICE**

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "A party may file and serve specific written objections to a magistrate judge's proposed findings and recommendation within 14 days after being served with a copy of the recommended disposition[.]"  A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).