UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Taariq Vanegas,

     Plaintiff,

v.

Carleton College,

     Defendant.

**MEMORANDUM OPINION
AND ORDER**
Case No. 19-cv-1878

Beau D. McGraw, McGraw Law Firm, P.A., Counsel for Plaintiff.

Sara Lewenstein and Sean R. Somermeyer, Faegre Drinker Biddle & Reath LLP, Counsel for Defendant.

This matter is before the Court on the parties' cross motions for summary judgment.  [Doc. Nos. 72 and 76]

## I.   Underlying Sexual Misconduct Claim

In the spring of 2017, Plaintiff was a sophomore at Carleton College ("Carleton") when he began to receive cryptic messages about a "night that no one would ever . . . know about."  (Somermeyer Decl., Ex. A (Plaintiff Dep. at 40-41).)  The texts included instructions for Plaintiff to meet at a specific location on campus at 2:00 a.m. on April 28, 2017, and to wear dark clothing and to

1

reschedule a final exam scheduled for the following day. (Id. at 41, 44-45.)

Plaintiff knew other students who had received similar communications and that

the event would involve substantial amounts of alcohol and other "crazy shit."

(Id. at 40, 44, 195-96.)

Jane Doe also received an invitation to this event, which was organized by

a group of Carleton students who constitute a secret club. (Id. Ex. N (Report at 1-

2).) The event was described as both an initiation and as a scavenger hunt. (Id.)

Plaintiff arrived at the designated location and time, where he and other

students found a box containing bottles of malt liquor and champagne.

(Somermeyer Decl., Ex. A (Plaintiff Dep. at 48).) Two students wore masks,

while approximately twelve students did not wear masks. (Id. at 47-49.) The

masked students told the others to finish all of the alcohol in the box. (Id. at 48-

49.)

Plaintiff and the others then proceeded to the next stop where they found a

box containing beer and Jell-O shots. (Id. at 50-51.) The students were again told

to drink all of the alcohol. (Id. at 51.) At the third stop, where they were

provided beer and cigarettes, the students were given stickers of different porn

sites and told to stick them up around campus. (Id. at 52.) From there, the

students were directed to the "island" where they were given snacks, white rum, Hot 100 and different fifths of alcohol.  (<u>Id.</u> at 53.)

At the final stop, there was a bonfire and the students were met by a number of masked students/chaperones.  (<u>Id.</u> at 55.)  The students were then given new names by the masked students, and told they were part of a brotherhood called DTX.  (<u>Id.</u> at 55.)  The students were then told to toilet paper the College President's home.  (<u>Id.</u> at 57.)  Plaintiff asserts he stayed close to his roommate because they planned to attend an early morning football workout. (<u>Id.</u> at 59.)

On the way to the President's home, Jane Doe came up to Plaintiff and started exchanging small talk.  (<u>Id.</u> at 59-60.)  Prior to that night, Plaintiff did not know Jane Doe.  (<u>Id.</u> at 60.)  Plaintiff claims that at some point, Jane Doe wrapped her arm around Plaintiff, and started to kiss him.  (<u>Id.</u> at 63-64.)  He said he was taken aback by her behavior because he was not part of the hook up culture at the school.  (<u>Id.</u> at 64.)  Plaintiff suggested they keep walking with the group. (<u>Id.</u>)

At some point, however, Jane Doe began to grope Plaintiff, which freaked him out as they were with a group of people.  (<u>Id.</u>)  Eventually, they split off

from the group and sat in a small park where they continued to kiss.  (Id. at 66.)

Plaintiff and Jane Doe then proceeded to Plaintiff's dorm room.  (Id. at 66-68.)

Security camera footage shows Plaintiff and Jane Doe entering the building at

5:05 a.m. (Bermal Decl., Ex. A.)  Plaintiff swiped his access card and led Jane

Doe, who had difficulty standing and maintaining her balance, through the

doors. (Bermal Decl., Ex. A at 5:05:20-5:05:50; Somermeyer Decl., Ex. A (Plaintiff

Dep. at 69-70).)  Plaintiff led Jane Doe up the stairs while she continued to lean

on him for support.  (Bermal Decl., Ex. A at 5:05:51-5:05:59.)

Once in Plaintiff's dorm room, Plaintiff got a glass of water, then sat on the

couch with Jane Doe.  (Somermeyer Decl., Ex. A (Plaintiff Dep. at 72).)  Then they

started to kiss, and soon began to engage in more physical touching and Plaintiff

took off his shirt.  (Id. at 74.)  Jane Doe then helped Plaintiff take off his pants and

she removed her boots, pants and underwear.  (Id. at 75.)  Jane Doe then told

Plaintiff she is on birth control, but asked Plaintiff to get a condom.  (Id.)

Plaintiff got a condom, put it on but before penetration, asked Jane Doe if she

was "okay with this."  (Id.)  Jane Doe kind of giggled and then said "yes."  (Id. at

76.)  They then proceeded to have sexual relations for ten minutes or so.  (Id. at

76-78.)

Afterward, Plaintiff quickly got dressed as he was running late for his workout.  (Id. at 78.)  He told Jane Doe she was welcome to stay and offered her a shirt to wear.  (Id. at 79.)  After Plaintiff left, Jane Doe wandered the hall wearing only a tee shirt and no pants.  (Bermal Decl., Ex. C at 5:55:03-5:55:11.)  She ended up in the dorm room of two students unknown to her.  (Somermeyer, Decl., Ex. N at 1.)  Those students, based on Jane Doe's behavior, believed she was incapacitated and called security for assistance.  (Id., Ex. E (Sillanpa Dep. at 31.)  While waiting for security, Jane Doe could not articulate how she got to the dorm or where she lived.  (Id. Ex. N (Report at 6).)  The two students reported that Jane Doe was sluggish and not making a lot of sense.  (Id.)

Security arrived and after assessing her condition, called emergency medical services and she was taken to Northfield Hospital.  (Id. at 11.)   At the hospital, her blood alcohol level was tested and found to be .24, or three times the legal limit.  (Id. Ex. E (Sillanpa Dep. at 76).)  She was given IV fluids and later released.  (Id. at 75.)

Later that day, Plaintiff got Jane Doe's phone number from a mutual friend and texted her about items she left in his dorm room.  (Id. Ex. A (Plaintiff Dep. at 83.)  They exchanged a few text messages, and at one point, Jane Doe asked

5

whether they had sex "Because I really don't remember anything."  (Id. Ex. N

(Report at CARLETON-00001040).)  Plaintiff responded "And I mean I definitely

remember we had sex.  Though the rest of the night was a blur."  (Id.)  Jane Doe

then asked whether he used a condom, and Plaintiff replied "Yeah!"  (Id.)

After this text exchange with Plaintiff, Jane Doe returned to the hospital for

a sexual assault exam.  (Id. at CARLETON-00001049.)  While completing the

sexual assault exam report, Jane Doe told the nurse that she did not remember

going to Plaintiff's dorm room or having sex with him.  (Id. at CARLETON-

00001056.)  After the exam, Jane Doe filed a sexual misconduct complaint against

Plaintiff.

## II.    The Sexual Misconduct Investigation, Hearing and Decision

### A.    Events Leading Up to the Filing of a Complaint of Sexual Misconduct

After arranging for Jane Doe's transport to the hospital, Security filed a

detailed report about the incident, which was sent to Amy Sillanpa, Carleton's

Title IX Coordinator.  (Somermeyer Decl., Ex. V (Incident Report); Ex. E (Sillanpa

Dep. 49-50).)  Sillanpa then contacted Jane Doe by email that same day to explain

that she was the person who meets with students who have been transported to

6

the hospital for alcohol overuse and to suggest that Jane Doe meet with her in the next week.  (Id. Ex. V at 6.)

On May 1, 2017, Jane Doe met with Sillanpa, at which time they went over Carleton's Policy Against Sexual Misconduct ("Policy") and Sillanpa answered Jane Doe's questions.  (Id. Ex. E (Sillanpa Dep at 54-55); Ex. F.)  She also showed Jane Doe the website which lists Carleton's Sexual Misconduct Advisors.  (Id. Sillanpa Dep. at 68.)  Jane Doe chose Laura Haave as her advisor.  (Id. at 68, 72.)

Sillanpa then contacted Plaintiff by email on May 2, 2017.  (Id. Ex. A (Plaintiff Dep. at 85); Ex. H.)  After he received the email, Plaintiff texted Jane Doe to "check in" with her.  (Id. Ex. A (Plaintiff. Dep at 93-94); Ex. I).  Plaintiff did so because he heard rumors were circulating that "sketchy stuff" had occurred with the hazing event.  (Id. Ex. A (Plaintiff Dep. at 93-94).)  Jane Doe did not reply to Plaintiff's May 2, 2017, text.  (Id. at 97.)

Later that week, Plaintiff met with Sillanpa and reviewed the no-contact order between him and Jane Doe.  (Id. at 90, 98; Ex. J.)  Plaintiff was also contacted by the Northfield Police Department seeking to interview him about a sexual misconduct incident.  (Id. at 109-111.)  After finding out the police were involved, Plaintiff's parents retained an attorney.  (Id. at 108-110; Ex. K.)

In an email dated May 10, 2017, Sillanpa informed Plaintiff that Jane Doe had filed a sexual misconduct complaint against him and that Carleton would be moving forward with an investigation. (Id. at 112; Ex. M.) Plaintiff was advised to be prepared to discuss the details of the incident, why he thought consent had been given and to provide relevant documentation and witnesses. (Id.) He was also encouraged to set up a time to meet with the investigator, Mary Dunnewold. (Id.)

Plaintiff and his attorney met with Sillanpa and received more information about the complaint process, and Sillanpa answered questions about timing, the investigation and the hearing. (Id. Ex. A (Plaintiff Dep. at 113-115).)

## B.    The Investigation

The individual assigned to conduct the sexual misconduct investigation was Mary Dunnewold. Dunnewold is a lawyer and has been employed by Carleton as an investigator since 2013. (McGraw Decl., Ex. 7 (Dunnewold Dep. at 16).) Prior to this position, Dunnewold was a law professor at Hamline Law School for over twenty years. (Id. at 11.)

During the investigation, Dunnewold interviewed thirteen people, including Plaintiff, Jane Doe, students involved in the hazing incident, security

personnel and others.  (Somermeyer Decl., Ex. B (Dunnewold Dep. at 105); Ex. N

(Report); Dunnewold Decl. ¶ 4.)  She reviewed a Witness First Conversation

Checklist with each witness – which summarized the interview process.  (Id. Ex.

B (Dunnewold Dep. at 106); Ex. N (Report at 2-11).)  Dunnewold gave all

witnesses she interviewed the opportunity to review her written summary of

their conversation and to suggest changes or additions.  (Id., Ex. B (Dunnewold

Dep. at 106); Ex. N (Report at 2).)  In addition to interviewing witnesses,

Dunnewold reviewed hospital records, text messages, GroupMe messages and

security camera footage.  (Id.)

Plaintiff met with Dunnewold on May 16, 2017.  (Id. at 4.)  During the

interview, Plaintiff described to her the events of the night in question.  (Id. at 4-

5.)  Dunnewold then showed Plaintiff and his attorney the security camera

footage she had received and asked him to comment on it.  (Id. at 5; Ex. A

(Plaintiff Dep. at 120-22).)  Plaintiff also explained to Dunnewold his view on

consent for the encounter and that he believed Jane Doe had initiated sex that

night.  (Id.)

After the meeting, Dunnewold provided Plaintiff and his attorney a

summary of Plaintiff's interview and invited them to make any additions or

corrections.  (Id. Ex. A (Plaintiff Dep. at 133).)  Plaintiff told Dunnewold he was

satisfied with the summary.  (Id. at 133.)

When Dunnewold concluded her investigation, she prepared a Sexual

Misconduct Investigation Report ("Report").  (Id. Ex. N.)  The Report recounts in

detail the results of Dunnewold's interviews and fact investigation, summarized

the relevant portions of the Policy – namely those relating to incapacitation and

consent – and provided analysis for applying the facts to the applicable Policy

provisions.  (Id.)  Attached to the Report were copies of the GroupMe messages

relating to the night in question, security videos, security reports, text messages

between Plaintiff and Jane Doe and Jane Doe's medical records.  (Id. Ex. A

(Plaintiff Dep. at 130-31); Ex. N; Dunnewold Decl. ¶ 6.)

When the Report was completed, Dunnewold provided it to Sillanpa, who

would determine whether there was sufficient information to charge Plaintiff

with a violation of the Policy.  (Id. Ex. E (Sillanpa Dep. at 77); Ex. G (Student

Sexual Misconduct Resolution Process ("Resolution Process") at 7).)  Based on

the Report, and in conjunction with the Policy, Sillanpa assessed whether it was

possible that Plaintiff violated the Policy.  (Id. Ex. E (Sillanpa Dep. at 80, 82).)

Sillanpa determined there was sufficient information to support a finding that Jane Doe was incapacitated and therefore unable to give consent.  (Id. at 87-88.)

On May 19, 2017, Sillanpa informed Plaintiff that she had made the decision there was sufficient information to charge him with a violation of the Policy.  (Id. Ex. A (Plaintiff Dep. at 134-36); Ex. O.)  Plaintiff declined to accept responsibility for the charge and elected to proceed to a hearing before a panel of the Community Board of Sexual Misconduct ("CBSM panel" or "panel").  (Id. Ex. A (Plaintiff Dep. at 136-37); Ex. G (Resolution Process at 7-8).)

Plaintiff and his attorney were provided a copy of the Report and the supporting materials and were invited to submit in writing any questions or challenges to it.  (Id. Ex. A (Plaintiff Dep. at 138); Ex. O.)  Plaintiff did not ask any questions or challenge any information in the Report.  (Id. Ex. A (Plaintiff Dep. at 141).)

Sillanpa then provided Plaintiff a list of names of individuals who might serve on the CBSM panel and asked him to identify anyone he believed could not decide the matter impartially.  (Id. Ex. A (Plaintiff Dep. at 137); Ex. O.)  Plaintiff initially identified several individuals that he believed may have issues with impartiality, and those individuals were excluded from serving on the CBSM

panel.  (Id. Ex. A (Plaintiff Dep. at 137, 141-42); Ex. P.)  With regard to those

eventually selected to serve on the panel, Plaintiff did not raise any conflict

issues at that time.  (Id. Ex. A (Plaintiff Dep. at 137).)

On May 25, 2017, Sillanpa met with Plaintiff and his attorney to prepare

for the hearing.  (Id. Ex. A (Plaintiff Dep. at 143-45).)  Plaintiff was informed that

while he could not question Jane Doe or other witnesses at the hearing, the

hearing was his opportunity to share his perspective and information with the

CBSM panel.  (Id. at 156-57.)

### C.     The Hearing

The hearing on Jane Doe's complaint took place on May 31, 2017.

(Somermeyer Decl., Ex. EE (Hearing Tr.); Ex. A (Plaintiff Dep. at 156).)  During

the hearing, Jane Doe and Plaintiff both provided an opening statement.  (Id. Ex.

EE.)  Then, the panel had the opportunity to question both Jane Doe and Plaintiff

separately.  (Id.)   Jane Doe and Plaintiff then gave closing statements.  (Id.)  After

the hearing, the panel met to determine whether it was more likely than not that

a Policy violation occurred.  (Id. Ex. EE (Hearing Tr. at 83); Ex. Y (CBSM Panelist

Guide.)  After its deliberations, the panel informed the parties that it found a

violation of the Policy had occurred on the basis that Jane Doe was incapacitated

and could not provide effective consent.  (Id. Ex. EE at 84; Ex. Y at 1-2.)  Jane Doe

and Plaintiff were then given the opportunity to make comments on the

appropriate sanction.  (Id. Ex. EE at 84-90.)  After that, the hearing was closed,

and the panel convened to a closed session to determine an appropriate sanction.

(Id. at 91.)

The panel concluded that the appropriate sanction was suspension for

three terms and that he would be required to complete training on sexual

misconduct.  (Id. Ex. R; Ex. Y at 3.)  The letter containing the panel's decision

informed the parties that they had the right to appeal the decision based on the

following grounds:  1) procedural error that substantially impacted the panel's

decision; 2) relevant new information that would have impacted the decision;

and 3) whether the sanction was inconsistent with the seriousness of the offense.

(Id. Ex. R; Ex. G (Resolution Process at 11-12).)

Plaintiff filed an appeal with the assistance of counsel.  (Id. Ex. A (Plaintiff

Dep. at 180, 187-88); Ex. S.)  The appeal asserted the following grounds: the

procedure used by Carleton did not meet the requirements established by the

Department of Education's Office of Civil Rights and resulted in procedural

errors which substantially impacted the decision; the panel did not have all the

relevant information pertaining to Plaintiff's intoxication and the relative intoxication of the parties; and that the sanction was inconsistent with the seriousness of the offense based on the facts alleged.  (Id. Ex. S.)  The appeal brief set forth in detail the bases of each claim.  (See Id.)

Jane Doe also filed an appeal, claiming the sanction of suspension did not match the seriousness of the offense, and urging that Plaintiff be expelled.  (Id. Ex. Z.)  The parties received copies of the others' appeal and were allowed to submit a response.  (Id. Ex. A (Plaintiff Dep. at 226-27); Exs. CC, DD.)

The appeal was decided by the Dean of Students, Carolyn Livingston, pursuant to the Policy.  (Id. Ex. G (Resolution Process at 11-12); Ex. D (Livingston Dep. at 86); Ex. U.)  Livingston reviewed and considered the entirety of the record, including the Report and its exhibits, the appeal materials from both parties, and the audio recording of the hearing.  (Id. Ex. D (Livingston Dep. at 54, 73-74, 79).)  She weighed the evidence and arguments against the three bases for appeal provided in the Policy.  (Id. at 62.)  Ultimately, Livingston agreed with the panel that Jane Doe was incapacitated and unable to give consent.  (Id. at 88.)  She further concluded that the sanction imposed by the panel did not match the

seriousness of the offense and amended the panel's disciplinary sanction to expel Plaintiff.  (Id. at 91; Ex. U.)

While the appeal was pending, Plaintiff transferred to another school.  (Id. Ex. A (Plaintiff Dep. at 253-54.)  Even if the appeal had gone in his favor, Plaintiff stated that he did not wish to return to Carleton.  (Id.)

## III.    Procedural Background

Plaintiff brought this action alleging five claims: Count I, Declaratory Judgment that Carleton's disciplinary process violated Title IX and regulations thereunder; Count II, Violation of Title IX; Count III, Negligence; Count IV, Violation of Title VI; and Count V, Violation of the Minnesota Human Rights Act alleging Plaintiff was subjected to harassment, discrimination and disparate treatment on the basis of race. (Doc. No. 28 (Amended Complaint).)

Carleton moved to dismiss all counts, and the motion was referred to Magistrate Judge Leo Brisbois.  Magistrate Judge Brisbois recommended that the motion be granted in all respects except for one narrow negligence claim. Holding that under Minnesota law, a private university must use reasonable care before making disciplinary decisions, Magistrate Judge Brisbois found that Plaintiff plausibly alleged that Carleton breached its duty of reasonable care in

15

the implementation of its Sexual Misconduct Policy (Doc. No. 32 (R&R at 24).)

Specifically, the Magistrate Judge found that the allegations that Carleton

"allegedly conduct[ed] an unreasonably rushed investigation and hearing, it is

plausible that Investigator Dunnewold and/or the CBSM unreasonably failed to

consider evidence that was favorable to Plaintiff." (Id.)

After conducting a de novo review of the record and carefully reviewing

Carleton's objections, this Court adopted the Report and Recommendation in its

entirety, and found that under Minnesota law, a private university must use

reasonable care before making disciplinary decisions.  (Doc. No. 37 (Order at 3

(citing Doe v. Univ. of St. Thomas, 368 F. Supp.3d 1309 (D. Minn. 2019)).)

Following this Court's Order, the Eighth Circuit Court of Appeals reversed

the district court's finding in Univ. of St. Thomas and held that a private

university's disciplinary decisions are subject to an arbitrary or capricious

standard – not a reasonable care standard.  Doe v. Univ. of St. Thomas, 972 F.3d

1014 (8th Cir. 2020).  Based on this change in the law, Carleton asked the Court to

revisit whether Plaintiff has stated a negligence claim under the heightened

arbitrary and capricious standard.  Applying the relevant standard for motions

to dismiss under Rule 12(b)(6), the Court found that Plaintiff had sufficiently

pleaded that Carleton acted arbitrarily during the investigation and adjudication of the sexual assault complaint against Plaintiff.

The parties then filed cross motions for summary judgment.

Following briefing on the motions for summary judgment, Plaintiff filed a motion, out of time, to amend the complaint to reallege his Title IX claim and his full negligence claim based on two recent cases of the Eighth Circuit – <u>Doe v. Univ. of Ark-Fayetteville</u>, 974 F.3d 858 (8th Cir. 2020) and <u>Does v. Regents of the Univ. of Minn.</u>, 999 F.3d 571 (8th Cir. 2021).

By Order dated September 1, 2021, Magistrate Judge Docherty denied the motion to amend on the basis that the motion was untimely and that he failed to show good cause to modify the pretrial schedule, mainly because the <u>Doe v. Univ. of Ark-Fayetteville</u> decision was issued months before the deadline to file amended pleadings.  (Doc. No. 115 at 10-11.)

Thus, the only remaining claim is whether Carleton was negligent under an arbitrary and capricious standard as determined under Minnesota law.

## IV.    Standard Summary Judgment

Summary judgment is appropriate if, viewing all facts in the light most favorable to the non-moving party, there is no genuine dispute as to any material

fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ.

P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The party seeking

summary judgment bears the burden of showing that there is no disputed issue

of material fact.  Celotex, 477 U.S. at 323.  "A dispute is genuine if the evidence is

such that it could cause a reasonable jury to return a verdict for either party; a

fact is material if its resolution affects the outcome of the case."  Amini v. City of

Minneapolis, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248, 252 (1986)).  The party opposing summary

judgment may not rest upon mere allegations or denials but must set forth

specific facts showing that there is a genuine issue for trial.  Krenik v. County of

Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

## V.    Discussion

The parties agree that Plaintiff's negligence claim is governed by

Minnesota law, and that under Minnesota law, the duty of care private

universities owe their students when investigating non-academic misconduct

claims is whether the university acted arbitrarily, capriciously or with bad faith.

Univ. of St. Thomas, 972 F.3d at 1018.

Minnesota law further provides that arbitrariness can be found where a college or university acts (1) without giving notice and an opportunity to be heard; (2) without gathering or considering evidence; and/or (3) with prejudice or ill-will.  See e.g., Abbariao v. Hamline Univ. Sch. of Law, 258 N.W.2d 108, 112 (Minn. 1977) (finding that plaintiff's claim of discriminatory grading procedures sufficiently alleged arbitrary conduct on behalf of the university and stated a claim for relief); Gleason v. Univ. of Minn., 104 Minn. 359, 363, 116 N.W. 650, 652 (1908) (finding plaintiff sufficiently alleged arbitrary conduct by university when he alleged he was not given notice or a hearing before he was expelled); Webster v. Marshall, 270 Minn. 292, 295, 133 N.W.2d 533, 535 (1965) (finding that an act is arbitrary if it represents the agency's will and not its judgment).

Further, "[a] university's decision may be arbitrary if the university violates its own procedures." Univ. of St. Thomas, 972 F.3d at 1019 (citing Tatro v. Univ. of Minn., 800 N.W.2d 811, 816 (Minn. Ct. App. 2011), aff'd on other grounds, 816 N.W.23d 509 (2012); Ganguli v. Univ. of Minn. 512 N.W.2d 918, 923 (Minn. Ct. App. 1994) ("The absence of findings by the panel and full Judicial Committee is troubling.  The University's own regulations require that the Judicial Committee make findings, conclusions, and recommendations.  By

failing to make findings of fact, the University violated its own procedures included within its contract with Ganguli. . . . Therefore, decisions that are rendered without findings are characterized as arbitrary and capricious.").  A policy violation does not necessarily render a decision arbitrary, however.  A plaintiff must show that the policy violation had an effect on the decision on the merits or in any way rendered the decision arbitrary or capricious.  Brisbois v. Univ. of Minn., No. A11-1720, 2012 WL 2505826 at *4 (Minn. Ct. App. July 2, 2012) (finding that plaintiff failed to establish that any of the procedural violations complained of had any effect on the decision or in any way rendered the decision arbitrary or capricious).

Finally, "a decision is not arbitrary or capricious if the [entity], presented with opposing points of view, reaches a reasoned decision that rejects one point of view."  Charles v. State of Minn. Dept. of Health, No. A07-703, 2008 WL 2168270, at *4 (Minn. Ct. App. May 21, 2008).  See also Brisbois,  2012 WL 2505826 at *4 (finding that not all policy violations render a decision arbitrary, rather the violation must have had an effect on the decision on the merits or in any way rendered the decision arbitrary or capricious).  Summary judgment in favor of the university is warranted if the Court finds that no rational trier of fact could

find in favor of Plaintiff.  <u>Rollins v. Cardinal Stritch Univ.</u>, 626 N.W.2d 464, 479

(Minn. Ct. App. 2001).

### A.    Cross Motions for Summary Judgment

The parties have brought cross motions for summary judgment.  Plaintiff

argues that he is entitled to summary judgment on his remaining negligence

claim because Carleton violated its own policies and procedures in reaching the

decision to expel him, rendering such decision arbitrary and capricious.  It is

Carleton's position that there are no genuine issues of material fact and that it is

entitled to summary judgment on the remaining negligence claim as the record

does not establish that the decision to expel Plaintiff was arbitrary or capricious.

### 1.    Destruction of Audio Recordings

Carleton's Policy provides that "[r]ecords related to sexual misconduct

allegations and investigations will be retained by the College for seven years."

(Somermeyer Decl., Ex. F (Policy at 8).)  Plaintiff asserts that Title IX regulations

also require that the records be maintained for a period of seven years.  36 CFR §

106.45(b)(10).

In her capacity as the investigator assigned to Jane Doe's sexual

misconduct complaint, Dunnewold was responsible for gathering evidence and

preparing a written report of her findings.  She then submitted her report to the

Title IX Coordinator, who was responsible for making the charging decision.

(Id., Ex. G (Resolution Process at 6 and 7).)

     During her investigation, while interviewing witnesses, Dunnewold made

audio recordings of the interviews as a personal memory aid.  (Id., Ex.B

(Dunnewold Dep. at 151).)  Dunnewold did not keep a copy of the audio

recordings, however.  (Id.)

     In her deposition, Dunnewold explained that prior to an interview, she

would ask the interviewee if it was okay that she record the interview.  (Id.)  She

also assured them that she would erase the recording after she completed the

report-writing process.  (Id.)  Dunnewold also took detailed notes, which she did

retain, during the interviews and used the recording if her handwriting was

unclear.  (Id. at 152-53.)

     After she prepared a written summary of the interview, Dunnewold

shared the summary with the witness, and incorporated any revisions from the

witness, and then finalized her summary.  (Id.)  Only after this process did she

delete the recordings.  (Id. at 151-152.)

Plaintiff argues that by destroying the audio tapes of the interviews, Dunnewold violated Carleton's policies and procedures in order to provide the hearing panel only with information she desired to provide.  Plaintiff argues that as a lawyer, Dunnewold was negligent in her implementation of Carleton's policies, and that it is incomprehensible that she would destroy evidence in a sexual misconduct case.

Even if deleting the audio tapes violated Carleton's policies, the Court notes that non-material violations do not establish arbitrariness.  Doe v. Univ. of St. Thomas, 972 F.3d at 1018, n.4   Instead, the violation must have had an effect on the decision on the merits or otherwise rendered the decision arbitrary or capricious.  Brisbois, 2012 WL 2505826 at *4.  Plaintiff has failed to make such a showing.  There is no evidence to suggest that Dunnewold withheld information provided by a witness, or that Dunnewold mischaracterized a witnesses' comments.  Dunnewold retained her notes and allowed each witness the opportunity to review her summary of the interview and suggest changes. Plaintiff affirmed at his deposition that he had reviewed Dunnewold's summary and had no corrections.  (Somermeyer Decl. Ex. A (Plaintiff Dep. at 133-34.)

Based on this record, the Court finds that no rational trier of fact could find that the destruction of the audio tapes rendered the decision to sanction Plaintiff arbitrary and capricious.  <u>Rollins</u>, 626 N.W.2d at 479.   Accordingly, summary judgment is warranted as to this alleged violation.

### 2.   Dunnewold Withheld Information on "Blackout Drinking"

The Policy defines "consent" as follows: "consent means the mutual understanding of words or actions freely and actively given by two informed people that a reasonable person would interpret as a willingness to participate in mutually agreed upon sexual activity."  (Somermeyer Decl., Ex. F (Policy at 3).) The Policy further defines "Incapacitation" as

> the physical and/or mental inability to make informed rational judgments. A person is incapacitated if they lack the necessary judgment to give consent to sexual activity.  For example, a person may be incapacitated when asleep or under the influence of alcohol or drugs to an extent that the person is not capable of making a knowing decision.  Knowledge of incapacity is evaluated based on a reasonable person standard. Accordingly, if a person has sexual contact with someone who that person knows to be or who a reasonable person would know to be, incapable of making a rational, reasonable decision, that contact violates this policy.

(<u>Id.</u> at 4.)

It is Plaintiff's position that Jane Doe consented to sexual intercourse with him on the night in question based on the following: that Jane Doe initiated

kissing Plaintiff; Jane Doe grabbed Plaintiff's penis over his clothes during the DTX event; Jane Doe was able to walk, talk coherently and ambulate during the entire course of sexual activity; Jane Doe told Plaintiff she was on birth control and asked Plaintiff to get a condom; in response to Plaintiff's question as to whether she wanted to have sex, Jane Doe answered "yes"; prior to sexual intercourse, Plaintiff removed her tampon; and Jane Doe participated enthusiastically in the sex and gave no indication to Plaintiff that she wanted to withdraw her consent. (See Amended Verified Complaint ¶¶ 63 - 103.)

During the hearing, Plaintiff submitted information to the panel on "blackout drinking" from the National Institute of Health that addressed what happens to one's physical and mental state when they are blackout drunk. (Id. ¶ 197.) The article provided that during a blackout, an individual's brain is unable to encode memories and the person's cognition is impacted where they are not aware of their actions. (Id.) The article further discussed how someone who is blackout drunk can appear to be fine to others. (Id.)

Plaintiff claims that Dunnewold did not provide any information to the panel on blackout drinking, despite the fact that she is aware of the effects of blackout drinking. (Somermeyer Decl., Ex. B (Dunnewold Dep. at 91).) Plaintiff

argues that during her deposition, Dunnewold said that, based on her knowledge of the effects of blackout drinking, that it was possible that Jane Doe's cognition was working during 2 to 5 a.m., that she could have been the initiator of kissing and fondling Plaintiff, and could have suggested having sex, but that at some time during 2 to 5 a.m., the portion of Jane Doe's brain that controls her memory could have turned off.  (Id. at 92-93.)  Plaintiff claims the record of this case, including witness interviews and other evidence, indicates a strong likelihood that Jane Doe experienced a blackout on the night in question, and that it could have reasonably appeared to Plaintiff that she was providing consent to sexual intercourse.  Yet, Dunnewold did not submit any information on blackout drinking, and the impact it would have on Plaintiff's belief that Jane Doe had consented.

Plaintiff claims that Dunnewold actions, by not disclosing her expertise and not educating the panel on the subject, resulted in a breach of Defendant's duty to Plaintiff because the issue of blackout drinking was key to the issue of consent and incapacitation.  If Jane Doe was blackout drunk during the sexual encounter, she could act and appear to provide consent while still not remembering what happened, and that Plaintiff's acceptance of that consent

could be viewed as appropriate based on a reasonable person standard.  Further,

Dunnewold had extensive training on campus sexual assault and is very familiar

with blackout drunkenness and its impact on cognition and behavior.  (Id. at 91-

94.)  By not including information on blackout drunkenness, Dunnewold

demonstrated she was not impartial and could only result in the panel making a

decision that was not fair or impartial.  Further, information on blackout

drunkenness from the investigator would have been deemed more credible by

the panel, as opposed to Plaintiff providing the information.

Carleton asserts that Plaintiff misconstrues Dunnewold's role as an

investigator, which was to collect evidence and prepare a written report, not to

educate the panel on blackout drunkenness or to make arguments on behalf of

either party.  The Policy provides that "[t]he Investigator is the person

designated by the College to investigate a complaint of sexual misconduct."

(Somermeyer Decl., Ex. F (Policy at 12).)  The Resolution Process provides:

> The investigator will conduct a prompt, thorough and impartial
> investigation and prepare a written investigative report.  In most
> circumstances,  the investigator will meet individually with the
> complainant and respondent at least once during the investigation.  The
> investigator may also meet with other persons who may have information
> about the incident, and may review e-mails, text messages, photographs,
> video surveillance and/or other physical, documentary or other evidence
> as appropriate and available.  The College will provide an opportunity

during the investigation for both the complainant and respondent to advise the investigator of any witnesses they believe should be interviewed and other evidence they believe should be reviewed by the investigator.

At the conclusion of the investigation, the investigator will submit a written investigative report to the Title IX Coordinator setting forth the information that was collected.  The investigator will also compile and submit to the Title IX Coordinator any documents or other evidence that will be provided to the CBSM panel.  The Title IX Coordinator may ask clarifying questions of the partis or may ask the investigator to conduct additional investigation if determined necessary.

(Id. Ex. G (Resolution Process at 6-7).)

Based on the record before it, it appears that Dunnewold fulfilled her role as investigator in this case.  She collected evidence and interviewed witnesses and prepared a written report for the panel.  Her report summarized the provisions of the Policy regarding incapacitation and provided analysis about the relevant definitions.  (Id. Ex. N (Report at 13.)  She included facts about Jane Doe's condition, information from Plaintiff that Jane Doe was the aggressor and how Plaintiff believed Jane Doe provided consent.  (Id. at 4-5.)  Plaintiff points to no authority that requires the investigator to gather or present evidence relevant to Plaintiff's defense to the complaint.  Even if such authority existed, the Court finds that Plaintiff did not demonstrate that by withholding her knowledge of "blackout drinking" from the panel, such omission affected panel's decision.

The record shows that the panel was presented evidence as to "blackout drinking." (Id., Ex. EE (Hearing Tr. at 71-72).)  Plaintiff also provided additional information on the issue of blackout drinking on appeal.  (Id. Ex. S at 12.)  The panel was also presented evidence, which is not disputed by Plaintiff, as to Jane Doe's incapacitation.  Based on that evidence, the panel found that Jane Doe was incapacitated and could not consent to sexual contact with Plaintiff.  "[A] decision is not arbitrary or capricious if the [entity], presented with opposing points of view, reaches a reasoned decision that rejects one point of view." Charles v. State of Minn. Dept. of Health, No. A07-703, 2008 WL 2168270, at *4 (Minn. Ct. App. May 21, 2008).  In this case, the panel rejected Plaintiff's claim that Jane Doe appeared to be able to consent to sexual activity based on the substantial evidence establishing her incapacitation.  The Court thus finds that Plaintiff has failed to demonstrate Carleton acted arbitrarily by rejecting Plaintiff's claim that he reasonably believed that Jane Doe had provided consent.

### 3.  Dunnewold Met with the CBSM Prior to Hearing

Dunnewold attended a meeting with the CBSM panel prior to the hearing. (Somermeyer Decl., Ex. B (Dunnewold Dep. at 127).)  Plaintiff argues neither the Policy nor the Resolution Process provide that such a meeting should take place.

Plaintiff further asserts he was not provided notice of this prehearing meeting.

Plaintiff argues that it was improper for the investigator to meet with the CBSM

prior to the hearing because the investigator's role is limited to collecting and

submitting evidence to the CBSM.

Sillanpa testified that she and the CBSM panel met with Dunnewold prior

to the hearing in order for her to present the investigative report and to discuss

logistics of the hearing.  (Id. Ex. E (Sillanpa Dep. at 103, 105-06); Ex. B

(Dunnewold Dep. at 127-28).)  Both Sillanpa and Dunnewold testified that they

meet with the CBSM panel before every hearing and that the prehearing meeting

at issue in this case lasted approximately one hour, and of that hour, Dunnewold

attended for 20 minutes.  (Id. Ex. B (Dunnewold Dep. at 127); Ex. F (Sillanpa Dep.

at 109-110).)

Carleton argues that without any evidence, Plaintiff misconstrues this

routine meeting as prejudicial or harmful to Plaintiff.  However, a plaintiff

cannot rely on unsupported allegations at summary judgment.  See Quinn v. St.

Louis City, 653 F.3d 745, 752 (8th Cir. 2011).

The Court agrees that Plaintiff has failed to cite to any evidence which

demonstrates that the meeting between Dunnewold, Sillanpa and the CBSM

panel affected the panel's decision.  As a result, Plaintiff has failed to demonstrate Dunnewold's attendance at the prehearing meeting rendered the decision to sanction him was arbitrary and capricious.

### 4. Title IX Coordinator Made Charging Decision Without Any Applicable Burden of Proof

Plaintiff argues that neither the Policy nor the Resolution Process includes a standard of proof, therefore the determination of whether to charge a student with a violation of the Policy is entirely subjective and left to a single person. Plaintiff further argues the implementation of the Resolution Process was done in an arbitrary and capricious manner as demonstrated by the fact that Sillanpa could not articulate how she arrived at her charging decision, or what standard applied, if any.  This argument misconstrues the record, however.

The Resolution Process provides that the Title IX Coordinator will review the investigative report and determine "whether there is sufficient information to support charging a student with a violation of the Sexual Misconduct Policy." (Id., Ex. G (Resolution Process at 7).)  Sillanpa testified that the standard she uses in making a charging decision is whether it "is possible that a Policy violation occurred." (Id. Ex. E (Sillanpa Dep. at 78-79).)   She further testified that the CBSM panel makes the decision as to whether a violation actually occurred.  (Id.)

Thus, the record establishes that Sillanpa followed the Resolution Process when she reviewed the report and materials submitted by Dunnewold and then determined there was sufficient information to support charging Plaintiff with a violation of the Policy.  (Id. Ex. G (Resolution Process at 7 (emphasis added); Ex. E (Sillanpa Dep. at 78-80).)  Therefore, Plaintiff has failed to show the charging decision was in violation of the Resolution Process or other policies.[1]

### 5.   Appeal of CBSM Decision Denied Without Applicable Standard of Review.

The Resolution Process provides that both parties may appeal the decision of the CBSM panel, and that if an appeal is submitted, the appeal will be determined by the Dean of Students, or if the Dean is unavailable or has a conflict, by the Vice President/Treasurer.  (Id., Ex. G at 11-12.)

Plaintiff appealed the CBSM panel's decision on three grounds: that the procedure used by Carleton did not meet the requirements established by the Department of Education's Office of Civil Rights and resulted in procedural error; the CBSM panel did not have all of the relevant information pertaining to

---

[1] Carleton also argues that what Plaintiff is really claiming is that the Policy was defective because it did not specify a standard of proof as to charging and appeal decisions. However, in the Report and Recommendation dated February 10, 2020, which was adopted by this Court, Magistrate Judge Brisbois had already found that the Policy was not deficient or negligent as written.  (Doc. No. 32 at 22.)

his intoxication and the relative incapacitation of the parties, including the entire

GroupMe text messages; and that the sanction imposed was inconsistent with the

seriousness of the offense based upon the facts alleged.  (Id. Ex. S.)  Jane Doe also

appealed the CBSM panel's decision, finding the sanction – a three term

suspension – was inconsistent with the seriousness of the offense.  (Id. Ex. U

(Appeal Decision).)

Carolyn Livingston is Carleton's Dean of Students and determined both

parties' appeals.  (Id. Ex. U.)  Livingston denied Plaintiff's appeal, finding no

procedural errors, and that the "new" evidence concerning Plaintiff's

intoxication was actually available at the time of the hearing.  (Id.)  Livingston

also found the evidence showed that Jane Doe was clearly incapacitated, and that

the appropriate sanction was expulsion.  (Id.)

Plaintiff argues that because the Resolution Process did not identify a

standard of review to be applied to an appeal decision, the appeal phase of

Plaintiff's case was done arbitrarily and capriciously.

The record does not support Plaintiff's claim that the appeal phase was

handled arbitrarily or capriciously.  First, during her deposition, Livingston was

asked what standard of review she applied when determining the parties'

appeals, and she responded "a preponderance of the evidence."  (Id., Ex. D
(Livingston Dep. at 61-62).)  Next, the record shows that Livingston reviewed the
entirety of the record, and after applying the grounds set out in the Policy, she
found there were no procedural errors that substantially impacted the final
decision.  (Id., Ex. D (Livingston Dep. at 54, 73-74, 79); Ex. U (Appeal Decision).)
She further found that the alleged new information in Plaintiff's appeal was
available prior to the hearing or would not have substantially affected the panel's
decision and that the sanction by the panel did not match the seriousness of the
offense.  (Id. Ex. U.)  Finally, in her deposition, she clarified with regard to what
standard is applied to appeals, that the preponderance standard applied to the
whole Policy.  (Id. Ex. D (Livingston Dep. at 63-64, "Q: So that's what you
understand in the appeal process, that you adhere to that preponderance of the
evidence analysis when you're determining the merits of the appeal?  A:  The
preponderance is for the entire policy.").)

6.      **Decision to Expel Plaintiff Done in Violation of Carleton's Policies and Procedures**

Carleton's Executive Authority Policy provides that no student will be
expelled without the specific consent of the President of the College.  The
"Executive Authority" section provides:

> The President of the College (or his/her designee) has the obligation to
> attempt to assure the safety of individuals, the protection of property, the
> continuity of the educational process, or the preservation of the legal status
> of the College.  In executing these obligations, the President (or his/her
> designee) is specifically empowered to determine the status of any student
> at any time.  The President (or his/her designee) may remove individuals
> from campus or prohibit individuals from being on campus and expel,
> suspend, or otherwise take action with respect to such individuals.  If a
> student is expelled, suspended, withdrawn or placed on leave of absence
> as a result of the exercise of executive authority, the terms upon which
> resumption of normal student status will be permitted, if any, will be
> stated at the time of the decision.  In any case, no student will be expelled
> without the specific consent of the President of the College.

(Somermeyer Decl. Ex. W.)

Plaintiff asserts there is no evidence in the record that Livingston obtained

the President's consent to expel Plaintiff.  However, Livingston testified at her

deposition that she obtained the President's consent before expelling Plaintiff.

(Id. Ex. D (Livingston Dep. at 95-97).)  Plaintiff has provided no evidence to

refute this testimony.  Accordingly, this claim fails.

### 7.    CLAP Article

Jane Doe published an article in a student-run publication called "the

CLAP" in which she described the DTX hazing event during which she and

others were told to drink excessive amounts of alcohol over several hours, that

she was "blackout drunk, sexually assaulted, then hospitalized for alcohol

poisoning". (Somermeyer Decl. Ex. X at 2-3.) Plaintiff was not named in the article. (Id.)

Prior to publishing the article, Jane Doe emailed it to her Sexual Misconduct Support Advisor Laura Haave. (Doc. No. 96-4 (McGraw Decl. Ex. 4).) Haave then sent the article to Dunnewold and Sillanpa with the message "I wanted you to be aware in case you feel that this will impact any current cases. Please feel free to follow up with Jane Doe if you have concerns." (Id.)

The next day, Haave wrote to Sillanpa and Livingston to inform them she had talked with Jane Doe, and that Jane Doe had agreed to wait until the school had made an announcement about the DTX event before she published the article. (Id.) Livingston then met privately with Jane Doe regarding the article. (Id. Ex. 7 (Livingston Dep. at 25).) During the meeting, Livingston asked Jane Doe to rethink publishing the article in the CLAP, which she considered a gossip publication. (Id.)

Plaintiff argues that allowing Jane Doe to publish the article in the CLAP is an act of retaliation against Plaintiff that is prohibited under the Policy. The Policy defines "retaliation" as:

> not limited to, abusive, coercive, violent, threatening, intimidating, discriminating or similar actions taken against an individual because of

36

that individual's participation in the sexual misconduct process.
Retaliation, by anyone, against a person involved in a sexual misconduct
process under this Policy – including the complainant, respondent,
witness, advisers, investigators, panel members, or anyone else
participating in the process – or against anyone who pursues legal action
alleging sexual misconduct – is prohibited and will not be tolerated.

(Somermeyer Decl., Ex. F (Policy at 7).)

Plaintiff argues that Jane Doe filed her sexual misconduct complaint on
May 10, 2017, and although the article was published on May 19 and did not
mention Plaintiff by name, it is logical that students and others on campus knew
the article was referring to Plaintiff.  Plaintiff believes that Jane Doe should have
been charged with retaliation, and that it stands to reason that the article had an
impact on the decision by the hearing panel.

Carleton asserts the CLAP is not a publication that is sponsored by
Carleton and Carleton exercises no control over what it publishes.  (Id. Ex. B
(Dunnewold Dep. at 78).)  Even if Plaintiff had been named in the article, federal
guidelines applicable at that time provided that parties to a sexual misconduct
complaint should not be prohibited from speaking about their experiences.  (Id.
Ex. C (Haave Dep. at 84-86); Ex. B (Dunnewold Dep. at 78) see also Q&A on
Campus Sexual Misconduct, Department of Education (September 2017), at 4,
available at https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-

201709.pdf ("Restricting the ability of either party to discuss the investigation

(e.g. through "gag orders") is likely to deprive the parties of the ability to obtain

and present evidence or otherwise to defend their interest and therefore is likely

inequitable.").)   In addition, the article written by Jane Doe and published in the

CLAP focused more on the hazing event and did not name Plaintiff. (Id. Ex. X at

2-3.)

      The Court agrees that the article written by Jane Doe focused on the hazing

event itself and that the purpose of the article was to warn other students that

hazing events were taking place on campus, and that such events are dangerous,

as evidenced by her experience of being sexually assaulted after participating in

the DTX event.  (Id.)  Further, there is no language in the article regarding the

sexual assault that can be considered "abusive, coercive, violent, threatening,

intimidating, [or] discriminating." (Id. Ex. 1 (Policy at 7).)  The article discusses

the assault as follows:  "I remember falling down, a guy picking me up.  I

remember the same guy straddled over mine.  Then I remember nothing."  (Id.

Ex. X at 2.)  She then wrote "Sometime after the bonfire, one of my 'brethren'

brought me to his room where he sexually assaulted me."  (Id. at 3.)

Based on the article as a whole, which mainly addresses the hazing event and the dangers such events present to students, and that Jane Doe was free to discuss her assault, the Court finds that the CLAP article does not fall within the Policy's definition of retaliation.  In addition, Plaintiff failed to demonstrate that the article had any effect on the panel's decision.

### 8.  Alleged Conflict of Student Panelist

The Resolution Process provides that once a panel is selected, the panel is informed of the parties' identities to determine whether any panel member has a relationship with either party that would affect their ability to decide the case impartially.  (Somermeyer Decl., Ex. G (Resolution Process at 8).)  In this case, once the panel was selected, Sillanpa emailed each panelist and asked them if they had a conflict of interest.  (Id. Ex. E (Sillanpa Dep. at 101).)  Plaintiff claims that the student panel member selected did not respond to Sillanpa's email.[2]  Plaintiff further claims that he later determined through Facebook that the student who did not respond to Sillanpa's email was a close friend of one of the

---

[2] The record does not support this claim, however.  At her deposition, Sillanpa testified that she could not recall if the student panel member responded to her email.  (Somermeyer Decl., Ex. E (Sillanpa Dep. at 101).)

student witnesses that Jane Doe confided in the day following the sexual assault. (Id. Ex. A (Plaintiff Dep. at 233-35).)  This claim fails for a number of reasons.

First, Plaintiff had the opportunity to object to this student panelist prior to the hearing, but failed to do so.  (Id. at 137, 176.)  Second, Plaintiff could have raised the issue when he was asked to review the potential panelists, but he failed to do so.  (Id. at 234-35, 141-42.).  Finally, Plaintiff can only speculate about the alleged Facebook conversation between the student witness and Jane Doe, and about the alleged friendship between the student witness and the student panel member.  The only evidence supporting the conflict of interest claim is Plaintiff's deposition testimony that he believed the student panel member was a close friend of a student witness that had a Facebook conversation with Jane Doe about the sexual assault, and that such belief was based solely on viewing Facebook.  Because Plaintiff has presented no other evidence to support the claim that the student panelist had a conflict of interest, the record does not support Plaintiff's claim that a conflict of interest rendered the CBSM panel's decision arbitrary.  Therefore, there is no evidence in the record that an actual conflict exists.  See Bloom v. Metro Heart Grp of St. Louis, Inc., 440 F.3d 1025, 1028 (8th

Cir. 2006) (finding that plaintiff's speculation and conjecture are insufficient to

defeat summary judgment).

### 9. Carleton Allowed Improper Evidence to be Presented to Panel and on Appeal

One day prior to the hearing, Sillanpa received an email from a student

who submitted a Community Concern Form ("CCF"). (Doc. No. 96 (McGraw

Decl., Ex. 9).) The CCF detailed an alleged incident that involved Plaintiff

grinding and attempting to make out with an intoxicated student at a party. (<u>Id.</u>)

The student spoke with Jane Doe, who stated she wanted the CCF to be

presented to the panel. (<u>Id.</u>) Sillanpa forwarded the email to Dunnewold, who

replied the CCF should not be presented to the panel. (<u>Id.</u>)

At the hearing, Jane Doe nonetheless testified as to the information

contained in the CCF. (Somermeyer Decl., Ex. EE (Hrg Tr. at 87).) Carleton did

not stop Jane Doe from talking about this CCF and did not inform the panel that

they should not consider such testimony.

Plaintiff claims it was improper for Carleton to allow information

contained in the CCF to be presented to the panel, and that it denied him a fair

and impartial hearing. Carleton responds that the Resolution Process did not

prohibit the panel from hearing Jane Doe's testimony about the CCF.

41

The Resolution Process provides:

**Information Considered by the CBSM Panel.**  In reaching a decision, the panel will only consider information included in the investigative report or presented at the hearing, pertinent College policies, and other documents or materials shared with the panel by the Title IX Coordinator.  A party's decision to not participate in an Adjudicated Hearing does not preclude a determination regarding a complaint.  Silence in response to an allegation will not be viewed as an admission of the allegation, but may leave the allegation undisputed.

Information about unrelated past behavior of the complainant and/or respondent, including the sexual history or dress of either party, <u>will typically be excluded from consideration</u>.

(Somermeyer Decl., Ex. G at 9.) (emphasis added).

As set forth above, there is no language in the Resolution Process that specifically excludes information about unrelated past behavior of the complainant or respondent.  Rather, the Resolution Process provides such information is typically excluded.  As a result, the Court finds that Plaintiff has not established there was a violation of the Resolution Process.  In addition, Plaintiff did not demonstrate the admission of Jane Doe's testimony regarding the information contained in the CCF affected the panel's decision.

B.     Conclusion

After reviewing the entire record, and in consideration of the applicable law, the Court finds that Plaintiff has not demonstrated that a rational trier of

fact would conclude that Carleton acted arbitrarily or capriciously when finding

that Plaintiff had violated the Sexual Misconduct Policy and that the appropriate

sanction was expulsion.

**IT IS HEREBY ORDERED** that:

1. Plaintiff's Motion for Summary Judgment [Doc. No. 72] is **DENIED**;

   and

2. Defendant's Motion for Summary Judgment [Doc. No. 76] is

   **GRANTED.**

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

Date:  December 13, 2021

s/Michael J. Davis
Michael J. Davis
United States District Court
